2000 Utah Ct. App. 236

**Sonia KELLEY, Petitioner and Appellee,**

v.

**Wayne KELLEY, Respondent and Appellant.**

No. 990711–CA.

Court of Appeals of Utah.

Aug. 3, 2000.

172

Ellen Maycock, Kruse Landa & Maycock, Salt Lake City, for Appellant.

James C. Haskins and Thomas N. Thompson, Haskins & Associates, Salt Lake City, for Appellee.

Before Judges GREENWOOD, JACKSON, and DAVIS.

DAVIS, Judge:

¶ 1 Respondent Wayne Kelley appeals the trial court's orders pertaining to his relationship with petitioner Sonia Kelley. For the reasons discussed below, we affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

**BACKGROUND**

¶ 2 Sonia and Wayne married on May 24, 1980 and subsequently had two children. During their marriage, Wayne worked in the construction industry. Wayne founded Altex Construction in Alaska and owned a majority interest in another company, DSI. Wayne's work required him to make extended stays away from home, during which he occasionally rented an apartment.

¶ 3 In 1994, the terms of a purchase by DSI of another company placed Wayne's personal assets at risk. To minimize this risk and protect the family home, Wayne and Sonia agreed to divorce, transfer title to Sonia individually, but continue to live as husband and wife. Accordingly, Sonia and Wayne obtained a divorce decree entered on July 18, 1994.

¶ 4 This decree provided that Sonia was awarded primary custody of the children, Wayne was to pay child support totaling $1,000 per month, and Sonia was "awarded the sum of not less than $1,000.00 per month as alimony from [Wayne], said alimony to continue for three years, or until [Sonia] remarries, or until terminated by statute, whichever shall occur first." Among the property distributed, Sonia was awarded the marital residence in Bountiful, Utah, and two automobiles. Wayne was awarded all other real property, one automobile, and his personal effects.

¶ 5 Following their 1994 divorce, Wayne and Sonia made no change in their pre-divorce relationship or living arrangements. Wayne and Sonia continued to cohabit, subject to the traveling demands of Wayne's work, which included obtaining an apartment in Texas. They did not tell their children or anyone else in the community that they had divorced. Their financial relationship remained the same, with Wayne providing funds "at the same standard of living which had existed prior to the entry of the Decree of Divorce."[1] They continued to socialize together, including attending a Christmas

1. This reflects an amount substantially greater than the amounts he was ordered to pay under the decree.

party in 1994 and taking a family vacation in 1995. In May 1995, Wayne gave Sonia an anniversary card indicating he loved her and wished to spend another fifteen years together.

¶ 6 In the fall of 1995, Sonia became suspicious that Wayne was romantically involved with another woman. With Wayne's assurance that the relationship was over, however, Wayne and Sonia reconciled—until a few months later. In the spring of 1996, Sonia discovered that Wayne had continued his relationship with the other woman, which precipitated a May 1996 altercation. Wayne subsequently cut off financial support for Sonia and Sonia sought legal counsel.

¶ 7 On July 10, 1996, Sonia moved to modify the divorce decree, asserting such decree was fraudulently obtained and that "[s]ince the entry of the Decree of Divorce, [Wayne] has fully supported the family by paying over to [Sonia] the approximate sum of $7,500 each month" but that said support had ceased. The court entered a temporary order which provided, inter alia, that Sonia have custody of the children, Wayne make child support and alimony payments totaling $6,000 per month, and that Wayne pay $5,000 in temporary attorney fees. Also on July 10, 1996, Sonia filed a separate action to establish a common law marriage between her and Wayne effective on the day the decree was entered, July 18, 1994, and to obtain a divorce therefrom. This second proceeding was consolidated with the first. In July 1997, Sonia filed another separate action against Wayne seeking damages for fraud and other claims, which was likewise consolidated into the divorce/modification proceedings.

¶ 8 Before the matter came for trial, on August 18, 1997, Wayne moved for partial summary judgment, arguing that there can be no establishment of a common law marriage following the 1994 divorce because no such adjudication or determination was obtained within one year of the relationship's termination as required by section 30–1–4.5(2) of the Utah Code. See Utah Code Ann. § 30–1–4.5 (1998). The trial court agreed that no timely determination was made, but concluded that the one year time restriction was unconstitutional. Specifically, the court concluded that although the restriction did not run afoul of the Open Courts Clause, see Utah Const. art. I, § 11, it did violate the Uniform Operation of Laws Clause. See Utah Const. art. I, § 24. Consequently, the court denied Wayne's motion for partial summary judgment.

¶ 9 The matter was addressed during a bench trial, after which the trial court made factual findings. Regarding the existence of a common law marriage, the court's findings included the following:

9. ... [Wayne] proposed that the parties should enter into a divorce so that the home could be placed in [Sonia's] name to protect it from potential of [sic] creditors. ... He represented to [Sonia] that the parties were not going to be separated and that nothing would change from how they had lived before.

10. During the Spring and Summer of 1994, the parties agreed to and did enter into a divorce action, resulting in a divorce being entered on the 18th day of July, 1994, in the District Court of Davis County. ... The Court finds that the agreement between the parties to divorce was an agreement for a non-traditional divorce which created a legal fiction only, designed to protect the residence of the parties from the threat of creditors.

11. ... Both of the parties attended a parenting class and the Court accepts the testimony of Dr. Marty Hood and finds it is credible that during the intermission halfway through the parenting class, [Wayne] approached her and told her that the divorce the parties were going through was only a business thing and that the children would never know there was even going to be a divorce and that there was no real need for them to continue to attend the class on how to deal with the children in a divorce situation. He further told her that there was not going to be a separation. ...

   ....

16. Prior to the divorce the standard of living of the parties was one in which respondent would give to petitioner $7,500 a month to pay bills. This arrangement

had existed for some substantial period of time....

17. Following the entry of the Decree of Divorce in July, 1994, there was no change in the relationship of the parties and in their living arrangements. The parties continued to live the same as they had prior to the divorce. Title to marital residence was not transferred until after this action was filed. The title to the Kodiak property was never transferred. The parties continued to maintain a joint checking account. The parties filed a joint 1994 income tax return, reflecting that they were husband and wife as of the end of 1994.[2] The parties continued to cohabit with sexual relations. The children, who at that time were nine and three and one-half years of age, were never told about any changes in their parents' relationship.

18. In July, 1994, the parties appeared at a counseling class and told the counselor that this divorce was only for business purposes and that the children would never know that the parties were divorced. The parties continued to socialize together; they attended a Christmas party together in December 1994, each held the other out as a married couple. No one in the community was told of the divorce at that time. During this time, respondent maintained an apartment in Texas.

. . . .

20. In May 1995, [Wayne] sent petitioner an anniversary card in which he indicated he loved her and a wish for another 15 years....

21. In the summer of 1995, as part of a family vacation, the parties traveled to Mexico, shared a room[,] and had sexual relations.

. . . .

24. During the entire period from the entry of the Decree of Divorce[,] the financial relationship remained the same and [Wayne] provided [Sonia] with funds at the same standard of living which had existed prior to the entry of the Decree of Divorce.

. . . .

27. The Court finds that as of the entry of the Decree of Divorce on July 18, 1994, [Sonia] knew that they would have to remarry. As of that day, the parties were unmarried. They continued their marital relationship, they continued to cohabit, they continued to treat each other as married, they had joint checking accounts, and [Wayne] maintained all of his personal property at the marital residence. The parties filed joint income tax returns for the 1994 year. [Wayne] sent [Sonia] money from which she serviced joint debts. The parties maintained joint credit cards. The parties held themselves out as married in the area of their domicile in Davis County, and in that area of the domicile had the reputation of being married. They held themselves out to their children as married. The parties continued to cohabit and hold each other out as spouse through April of 1996. The parties had a reputation in the community for being married and all of these actions arise out of a contract between two consenting parties.

The court further determined that Wayne had the current ability to produce $10,000 per month in income.

¶ 10 Through its findings and conclusions and the new divorce decree, both entered July 22, 1999, the trial court concluded: (1) that Sonia's action based upon fraud must fail; (2) that the parties entered a common law marriage which "commenced immediately following the entry of the Decree of Divorce" on July 18, 1994, and terminated in June 1996; and (3) that there was a change of circumstances since the first divorce decree "based upon the common law marriage of the parties" warranting a modification of the first decree. The court dismissed Sonia's suit for fraud and related matters, declared the existence of a common law marriage, granted Sonia a divorce, and modified the first decree to redistribute the property. The court further awarded custody of the children to Sonia and ordered Wayne to pay $2,000 per month child support and $3,000 per month alimony. Regarding the alimony, the court ordered that "based upon the mar-

**2.** *See* I.R.C. § 7703(1) (1999) ("[T]he determination of whether an individual is married shall be made as of the close of his taxable year....").

riage of the parties from 1980 to 1996, [Sonia is entitled to alimony] for the period of 16 years or until such time as [Sonia] remarries, cohabits[,] or the death of either party." Finally, the court reduced to judgment the arrearages at that time "[f]rom the entry of the Temporary Order through the month of February, 1999," reflecting credit for Wayne's payments, totaling $56,151.60 for alimony and $37,434.40 for child support.[3] The court likewise reduced to judgment Sonia's attorney fees of $35,951.

¶ 11 After trial, Sonia moved the court to find Wayne in contempt for failing to pay the full amount of child support and alimony required by the temporary support order. Wayne did not dispute his failure to pay, claiming instead that he was unable to pay. During a hearing on the motion, Wayne testified to owing substantial debt and that his sole source of income was through his employment for Omega Oil at a salary of $6,000 per month. Wayne also testified that he was previously able to contribute to the support of Sonia and the children because he drew $10,000 per month as a loan from DSI and another $10,000 income per month from the Kodiak property. The court found that Wayne was aware of and failed to comply with the temporary order. Based on the evidence adduced at the hearing and its factual finding at trial, the court further found that Wayne had the ability to earn at least $10,000 per month and historically lived "far beyond that kind of income." Accordingly, the court determined that Wayne had the ability to comply with the temporary order and by clear and convincing evidence he was in contempt of court. The court stayed imposition of sanctions provided he begin to make payment on and remain current with his obligations.

¶ 12 Wayne appeals.

## ANALYSIS

### I. Non-solemnized Marriage Statute

¶ 13 Wayne first asserts the trial court erred in finding the time restriction of Utah Code Ann. § 30–1–4.5(2) (1998) unconstitutional and that such restriction barred the determination that there existed a valid non-solemnized marriage between Wayne and Sonia. The constitutionality and proper interpretation of a statute presents questions of law which we review for correctness. *See State v. Lopes*, 1999 UT 24, ¶ 6, 980 P.2d 191; *Rushton v. Salt Lake County*, 1999 UT 36, ¶ 17, 977 P.2d 1201.

¶ 14 In 1987, the Legislature adopted section 30–1–4.5 of the Utah Code to provide a mechanism by which the state will recognize a relationship as a marriage although there was no solemnization. This is commonly referred to as a common law marriage. The statute, however, restricts the time in which such a marriage may be established by providing: "The determination or establishment of a marriage under this section must occur during the relationship described in subsection (1), or within one year following the termination of that relationship." Utah Code Ann. § 30–1–4.5(2) (1998). In *Bunch v. Englehorn*, 906 P.2d 918 (Utah Ct.App.1995), this court examined the plain language of that requirement and held that, "those who wish to establish their relationship as a marriage recognized by the state must obtain 'a court or administrative order' ... within one year of the termination of the relationship." *Id.* at 920 (quoting Utah Code Ann. § 30–1–4.5(1)(1995)). In *Bunch*, because no order was entered within one year of the relationship's termination, we affirmed the dismissal of the action. *See id.* at 920–21.

¶ 15 The Utah Supreme Court has held that the Legislature has broad discretion to set time limits within which to bring actions, *see Lee v. Gaufin*, 867 P.2d 572, 576 (Utah 1993), and recognized that limits to when claims can be brought promote the legitimate goals to "suppress stale and fraudulent claims so that claims are advanced

---

**3.** In determining the appropriate amount then in arrears, in the divorce decree entered July 22, 1999, the court stated that the $5,000 per month alimony and child support award shall commence as of December 1998. Further, in the immediately following paragraph, the court ordered that this amount shall be "retroactive to the date of the first Order entered by Commissioner Dillon in this action."

while evidence to rebut them is still fresh." *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 1999 UT 18, ¶ 14, 974 P.2d 1194. Recently, however, the Utah Supreme Court announced its decision in *In re Marriage of Gonzalez*, 2000 UT 28, 1 P.3d 1074 (plurality opinion). In *Gonzalez*, a majority of the supreme court concluded that notwithstanding the plain language[4] of section 30–1–4.5(2), and this court's decision in *Bunch*, section 30–1–4.5's time restriction "requires only the *filing* of a petition for adjudication of marriage within one year after the termination of the relationship." *Gonzalez*, 2000 UT 28 at ¶ 30; *see id.* at ¶ 48 (Zimmerman, J., concurring).

¶ 16 Looking at the facts here in light of *Gonzalez*, we must conclude the trial court erred in its initial determination that an establishment of a common law marriage was untimely under section 30–1–4.5(2). By the court's findings, the relationship continued at least until the May 1996 altercation. Because Sonia filed her action to establish the common law marriage July 10, 1996, it was well within the time restriction of section 30–1–4.5(2) as interpreted by the *Gonzalez* court. *See id.* at ¶ 30. Consequently, although the court erred in concluding the establishment was untimely and it did not need to reach the constitutional issues, it correctly denied Wayne's motion for partial summary judgment on that basis.

¶ 17 In his reply brief, Wayne asserts that *Bunch* rather than *Gonzalez*, applies here because Sonia sought to establish a common

law marriage *and* a divorce. Wayne relies on dicta in *Gonzalez* in which the court purported to distinguish, rather than overrule, *Bunch* because no divorce was sought in *Gonzalez*. See *Gonzalez*, 2000 UT 28 at ¶ 29 n. 7. However, we can find no support for the proposition that in enacting section 30–1–4.5, the Legislature intended to create different rules and results for cases in which an establishment *and* a divorce is sought, and cases in which an establishment alone is sought. Unless this court is somehow now able to write new legislation contrary to statutes governing divorce, the distinction offered in *Gonzalez* is meaningless, notwithstanding the supreme court's protestations to the contrary. Consequently, we have no option but to conclude that *Gonzalez* overruled *Bunch* and applies here notwithstanding that Sonia sought to both establish the marriage *and* obtain a divorce.

## II. Establishment of Common Law Marriage

¶ 18 Wayne asserts next that we should reverse the establishment of a common law marriage as unsupported by sufficient findings.[5] In substance, however, Wayne does not assail the sufficiency of the court's findings, but the sufficiency of the evidence supporting those findings. "We do not reverse a trial court's findings of fact unless they are clearly erroneous." *Young v. Young*, 1999 UT 38, ¶ 15, 979 P.2d 338; *accord* Utah R. Civ. P. 52(a); *Pennington v. Allstate Ins. Co.*, 973 P.2d 932, 937 (Utah

---

4. As Justice Russon explained:
    [T]he trial court did not err in dismissing Gonzalez's petition for failure to meet the jurisdictional time limitation set forth in Utah Code Ann. § 30–1–4.5. Justice Durham's opinion does not even attempt to read the statute on the basis of its plain language, but instead simply rewrites its provisions by attributing motives to the legislature. Although the requirement relating to conclusion, rather than commencement, of legal proceedings is unusual and could potentially raise constitutional concerns in certain hypothetical scenarios, this case is not one of them.
    *Gonzalez*, 2000 UT 28 at ¶ 52 (Russon, J., dissenting).

5. Section 30–1–4.5 sets out those factors necessary to determine the existence of a non-solemnized marriage:

A marriage which is not solemnized according to this chapter shall be legal and valid if a court or administrative order establishes that it arises out of a contract between two consenting parties who:
    (a) are capable of giving consent;
    (b) are legally capable of entering a solemnized marriage under the provisions of this chapter;
    (c) have cohabited;
    (d) mutually assume marital rights, duties, and obligations; and
    (e) who hold themselves out as and have acquired a uniform and general reputation as husband and wife.
Utah Code Ann. § 30–1–4.5(1) (1998).

1998). Further, to determine if the findings are against the clear weight of the evidence and thus clearly erroneous, we view the facts in the light most favorable to the findings. *See State v. One 1984 Oldsmobile,* 892 P.2d 1042, 1043 (Utah 1995); *Lefavi v. Bertoch,* 2000 UT App 5, ¶ 17, 994 P.2d 817.

¶ 19 Wayne asserts that the court failed to make findings dealing with the following evidence: (1) his spending time in Texas in a home wherein another woman resided; (2) Sonia asking Wayne if he was planning to marry this other woman; and (3) testimony regarding the reputation as husband and wife was given only by Utah residents. In so doing, Wayne merely reargues his view of the evidence. He has failed to marshal the other evidence supporting the court's findings on the section 30-1-4.5(1) factors as required,[6] *see Lefavi,* 994 P.2d 817, 2000 UT App 5 at ¶ 17, or demonstrate that the findings were clearly erroneous. Simply stated, we are not persuaded that the findings were against the clear weight of the evidence.

### III. Modification of the Decree

¶ 20 Wayne argues the court erred in modifying the first divorce decree because there was no substantial change of circumstances. "[A]lthough we generally review the determination to modify a divorce decree for an abuse of discretion, insofar as that determination is based on a question of law, we review it for correctness." *Krambule v. Krambule,* 1999 UT App 357, ¶ 10, 994 P.2d 210; *accord Toone v. Toone,* 952 P.2d 112, 114 (Utah Ct.App.1998).

¶ 21 The trial court determined there was a substantial change of circumstances based on the parties' entry into a common law marriage and Wayne's termination of support payments to Sonia. As we recently explained, "principles of res judicata require that 'a party seeking modification of a divorce decree must demonstrate that a substantial change in circumstances has occurred since the entry of the decree, and not contemplated in the decree itself.'" *Krambule,* 994 P.2d 210, 1999 UT App 357 at ¶ 13 (citation omitted); *see also* Utah Code Ann. § 30-3-5(3), (7)(g)(i) (stating that the court has continuing jurisdiction to make changes to custody, support and alimony awards)(Supp.1999).

¶ 22 We conclude that remarriage and/or failure to make support payments cannot alone justify a modification. Regarding remarriage, there is simply no support for the proposition that remarriage is per se a substantial change of circumstances. Absent explicit record support, it is hard to imagine that remarriage is unforeseen or not contemplated at the time of the divorce in virtually every case.[7] Indeed, the divorce decree here explicitly recognized the possibility by providing that alimony would "continue for three years, or until [Sonia] *remarries,* or until terminated by statute, whichever shall occur first," (emphasis added) and section 30-3-5(8) provides that "any order of the court that a party pay alimony to a former spouse automatically terminates upon the *remarriage* or death of that former spouse." Utah Code Ann. § 30-3-5(8) (Supp.1999) (emphasis added). In addition, if Wayne failed to pay child support and alimony as ordered in the decree, Sonia's remedy is to enforce, not modify, the original decree when she has neither alleged nor shown a change in the position of the parties relevant to her need or Wayne's ability to pay.

---

6. For example, Wayne showed his consent to the common law marriage by filing a joint 1994 tax return, making statements to Dr. Hood at the parenting class, continuing financial support far above the level ordered in the original decree, maintaining joint accounts with Sonia, continuing cohabitation and sexual relations with Sonia, giving Sonia an anniversary card expressing his love and desire for another fifteen years together, and failing to tell anyone in the community about the divorce. Further, because Wayne's maintaining an apartment in Texas is consistent with his pre-divorce conduct and the demands of his work, it does not necessarily rebut the proposition that he cohabited with Sonia. Finally, there was testimony of neighbors showing Wayne and Sonia had a reputation in the community for being married.

7. There has been no showing that remarriage to the former spouse should be treated materially different in this respect than remarriage to a third party.

¶ 23 We therefore hold that the trial court erred in modifying the divorce decree because there was no substantial change in circumstances. Rather, the original decree continues in full effect.

▮▮▮ ¶ 24 The court purported to allocate property between the parties by way of both modification of the original decree and pursuant to the second decree. While it is inappropriate to modify the original decree, the court is free to allocate property brought into and/or acquired during the common law marriage. The court must approach that allocation in accordance with our decision in *Burt v. Burt,* 799 P.2d 1166 (Utah Ct.App. 1990).

> [T]he court should first properly categorize the parties' property as part of the marital estate or as the separate property of one or the other. Each party is presumed to be entitled to all of his or her separate property and fifty percent of the marital property. But rather than simply enter such a decree, the court should then consider the existence of exceptional circumstances. . . .

*Id.* at 1172; *accord Hall v. Hall,* 858 P.2d 1018, 1022 (Utah Ct.App.1993). Because the court allocated property pursuant to the decree dissolving the common law marriage without applying the *Burt* systematic approach or addressing exceptional circumstances, we reverse that part of the order and remand for further findings in accordance with *Burt.*

### IV. Temporary Support Order

▮▮▮ ¶ 25 Wayne next argues that the court erred by imposing a temporary alimony and child support order because at that time there had been no determination that Wayne and Sonia entered a common law marriage. However, in addition to establishing her second marriage to Wayne, Sonia also sought to modify the divorce decree. In *Wells v. Wells,* 871 P.2d 1036, 1040 (Utah Ct.App. 1994), this court interpreted sections 30–3–3(3) and 30–3–5(3) and held that "trial courts have equitable powers to award temporary alimony on a petition to modify." Although the *Wells* court affirmed the denial of a modification petition that sought an increase in alimony, it determined that the trial court was able to make a temporary award and erred in failing to consider the petitioner's needs. *Id.* at 1040–41. Likewise here, Sonia sought to modify the divorce decree. Consequently, as explained in *Wells,* the court had the equitable authority to make a temporary order of support and reversal is not warranted on this basis.[8]

### V. Alimony

▮▮▮ ¶ 26 Next, Wayne seeks reversal of the alimony award of $3,000 per month, arguing that the court made insufficient findings, and the findings were unsupported by sufficient evidence. "In determining whether to award alimony and in setting the amount, a trial court must consider the needs of the recipient spouse; the earning capacity of the recipient spouse; the ability of the obligor spouse to provide support; and, the length of the marriage." *Rehn v. Rehn,* 1999 UT App 41, ¶ 6, 974 P.2d 306; *see* Utah Code Ann. § 30–3–5(7)(a)(i)–(iv) (Supp.1999).[9] "If these factors have been considered, ' "we will not disturb the trial court's alimony award unless such a serious inequity has resulted as to manifest a clear abuse of discretion." ' " *Childs v. Childs,* 967 P.2d 942, 946 (Utah Ct.App.1998) (omitting citations).

▮▮▮ ¶ 27 We first address the duration of the alimony award. The Utah Code provides, "Alimony may not be ordered for a duration longer than the number of years that the marriage existed unless, at any time prior to termination of alimony, the court

---

8. Because the amounts for retroactive child support and alimony based on the second divorce decree appear to be the same as the temporary order arrearages, we do not address the impact of the reversal of the order for modification on that amount.

9. On May 3, 1999, approximately six months after the trial in this case, an amendment to section 30–3–5 became effective adding the further factors the court must consider. *See* Utah Code Ann. § 30–3–5(7)(a)(v)–(vii) (Supp.1999). Because these additional requirements were not in effect during the relevant period here, we do not consider them. *See Wilde v. Wilde,* 969 P.2d 438, 442–43 (Utah Ct.App.1998).

finds extenuating circumstances that justify the payment of alimony for a longer period of time." Utah Code Ann. § 30–3–5(7)(h) (Supp.1999); *see also Rehn,* 1999 UT App 041 at ¶ 14.

¶ 28 The trial court found that Sonia and Wayne entered a common law marriage that began on July 18, 1994 immediately following the entry of the divorce decree on that date. In *Whyte v. Blair,* 885 P.2d 791 (Utah 1994), the supreme court held that when a non-solemnized marriage is established under section 30–1–4.5, the actual duration of the relationship, predating such establishment, is recognized. *See id.* at 793–94. Hence, upon entry of the order establishing the marriage here, Wayne and Sonia were remarried on July 18, 1994, thereby terminating her entitlement to alimony under the first decree.[10] Because the court made no finding of extenuating circumstances, the time for which the court may order alimony is limited by section 30–3–5(7)(h) to the duration of the common law marriage, to wit: five years.[11] Consequently, the court's findings were inadequate to support an alimony award for a period of sixteen years. We thus reverse its order in this respect and "remand for the entry of further findings addressing whether extenuating circumstances exist as to satisfy section 30–3–5(7)(h)." *Rehn,* 1999 UT App 041 at ¶ 14.

¶ 29 We further conclude the court's additional required findings supporting the amount of the alimony award were sufficient. The court considered Sonia's needs, finding her reasonable monthly expenses to be $5,000 per month; her earning capacity, finding she was able to produce an income of $1,498 per month; and Wayne's ability to pay, finding he had the ability to produce over $10,000 and although his expenses were $10,500, a substantial portion related to a second home which was to be sold. Wayne has not shown these findings are clearly erroneous as unsupported by sufficient evidence.[12] Accordingly, the court did not abuse its discretion in determining that the $3,000 per month is an appropriate amount of alimony.

## VI. Attorney Fees

¶ 30 Wayne seeks reversal of the attorney fees award as supported by insuffi-

---

10. The first decree provided, "The Plaintiff is hereby awarded the sum of not less than $1000.00 per month as alimony from Defendant, said alimony to continue for three years, or until the Plaintiff remarries, or until terminated by statute, whichever shall occur first." *See also* Utah Code Ann. § 30–3–5(8) (Supp.1999).

We agree with Sonia's position in her supplemental brief supporting the efficacy of the first decree that the circumstances surrounding the obtaining of the first decree do not amount to fraud on the court. The better reasoned analyses of the issue make a clear distinction between fraud on the court and other fraud or misrepresentation which may occur in the context of a proceeding.

"[T]he term [fraud on the court] as used in obtaining relief from judgment must be narrowly construed to embrace only that type of conduct which defiles the court itself, or fraud which is perpetrated by officers of the court so as to prevent the judicial system from functioning in the customary manner of deciding the cases presented in an impartial manner." *Serzysko v. Chase Manhattan Bank* (C.A.2, 1972), 461 F.2d 699; *Konigsberg v. Security Natl. Bank* (S.D.N.Y.1975), 66 F.R.D. 439; *Armour and Company v. Nard* (N.D.Iowa 1972), 56 F.R.D. 610; *Lockwood v. Bowles* (D.D.C.1969), 46 F.R.D. 625; Moores Federal Practice 504, 515 Paragraph 60.33 (1975). Examples of fraud on the court justifying relief from judg-

ment would include such 'egregious misconduct' as bribery of a judge or jury, or fabrication of evidence by counsel. *Pfizer, Inc., v. Intl. Rectifier Corp.* (C.A.8, 1976), 538 F.2d 180, certiorari denied 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751, *or the prevention of an opposing party from fairly presenting his case.* Keys v. Dunbar (*C.A.9, 1969*), *405 F.2d 955, certiorari denied* 396 U.S. 880, 90 S.Ct. 158, 24 L.Ed.2d 138; see, generally, Restatement of Judgments, *Sections 118–124 (1942).*

*Moore v. Moore,* No. 3–82–19, 1983 Ohio App. LEXIS 12995, at *3–*4 (Ohio App.3d, June 23, 1983) (citation omitted); *see also Davis v. Parrish,* 131 Idaho 595, 961 P.2d 1198, 1200 (1998) ("[F]raud upon the court will be found only in the presence of such tampering with the administration of justice as to suggest a wrong against the institutions set up to protect and safeguard the public." (quoting *Compton v. Compton,* 101 Idaho 328, 612 P.2d 1175, 1181 (1980))); *Sargent County Bank v. Wentworth,* 547 N.W.2d 753, 761 (N.D.1996); *Godin v. Godin,* 168 Vt. 514, 725 A.2d 904, 908 (1998).

11. The divorce decree terminating the common law marriage was entered on July 22, 1999.

12. Again, Wayne fails to marshal the evidence to show the findings are clearly erroneous, and merely reargues his view of the evidence. *See Lefavi,* 994 P.2d 817, 2000 UT App 5 at ¶ 17.

cient findings. "The decision to award attorney fees and the amount thereof rests primarily in the sound discretion of the trial court. However the trial court must base the award on evidence of the receiving spouse's financial need, the payor spouse's ability to pay, and the reasonableness of the requested fees." *Childs*, 967 P.2d at 947 (citation omitted).

¶ 31 Wayne does not dispute that the court made the appropriate findings regarding the reasonableness of the attorney fees, that Sonia was unable to pay the fees, or that the court found Wayne had "a substantial ability to earn an income." Instead, Wayne relies on his earlier argument that the court erred in finding that he had an income of $10,000 per month. Just as that argument failed because Wayne did not demonstrate the finding was clearly erroneous, so must this one. Consequently, we conclude the court did not abuse its discretion in awarding attorney fees.

### VII. Contempt of Court

¶ 32 Finally, Wayne argues there was insufficient evidence to support the court's finding of contempt of court. "The decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action 'is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion.'" *Marsh v. Marsh*, 1999 UT App 014, ¶ 8, 973 P.2d 988 (quoting *Bartholomew v. Bartholomew*, 548 P.2d 238, 240 (Utah 1976)) *cert. denied*, 982 P.2d 89 (Utah 1999). "'To find contempt, the court must find from clear and convincing proof that the contemnor knew what was required, had the ability to comply, and willfully and knowingly failed and refused to do so.'" *Id.* at ¶ 10 (quoting *Kunzler v. O'Dell*, 855 P.2d 270, 275 (Utah Ct. App.1993)).

¶ 33 Wayne argues the evidence was insufficient to show he had the ability to comply with the court's order—i.e., that he had sufficient income to make payments in accordance with the court's temporary order. Again, Wayne merely reargues his view of the evidence. Nonetheless, the court's find-ings that he was able to comply with the temporary order because he had the ability to earn at least $10,000 per month and historically lived "far beyond that kind of income," is strongly supported by evidence adduced at the contempt hearing and at trial. Specifically, Wayne testified to an income from Omega Oil alone of $6,000 per month and he confirmed a pattern of characterizing income as loans, part of which he previously contributed to the support of Sonia and the children, showing an ability to earn a greater income. Consequently, we reject his argument that the court erred by finding Wayne in contempt of court.

### CONCLUSION

¶ 34 We conclude that although the trial court erred in finding the time restriction of section 30–1–4.5 unconstitutional, under the subsequent Utah Supreme Court decision *In re Marriage of Gonzalez*, it correctly determined that Sonia's action to establish a common law marriage was timely. Further, the evidence was sufficient to support the court's determination that Wayne and Sonia did in fact enter a common law marriage that commenced the same day as entry of the divorce decree in their first marriage.

¶ 35 Nonetheless, we further conclude that the court erred in determining there had been a substantial change of circumstances following entry of the first divorce decree. Remarriage and/or nonpayment of previously ordered support cannot alone constitute a substantial change of circumstances. Therefore, we reverse that part of the order allocating property by way of both modification of the original decree and pursuant to the second decree, and we remand for findings in accordance with the approach set forth in *Burt*. See *Burt v. Burt*, 799 P.2d at 1172. Additionally, pending resolution of the petition to modify, the court was within its discretion in entering a temporary support order.

¶ 36 Finally, because Wayne failed to demonstrate the court's factual findings were clearly erroneous, his challenges to the amount of alimony awarded, attorney fees, and contempt ruling necessarily fails. None-

theless, because Sonia entered a new (common law) marriage at the time the first divorce decree was entered, the remarriage terminated her right to alimony from the first marriage. Consequently, when awarding a divorce from the second (common law) marriage, the court erred by ordering alimony for a period that exceeded the duration of that second marriage.

¶ 37 Accordingly, we reverse the trial court's determination that there were changed circumstances allowing modification of the first decree, remand for further findings regarding the property distribution, and limit the duration of alimony under the current decree to five years.

¶ 38 I CONCUR: Pamela T. GREENWOOD, Presiding Judge.

JACKSON, Judge (dissenting):

¶ 39 In 1987, the Utah Legislature invited the institution of common-law marriage into the homes of this state as a means of correcting certain "man in the house" welfare problems. *See* Utah Code Ann. § 30–1–4.5 (1998); *In re Marriage of Gonzalez*, 2000 UT 28, ¶ 21, 1 P.3d 1074 (stating "apparent aim [of statute] was ... to prevent the exclusion of an alleged 'common law' spouse's income when an applicant for government benefits was made, thus preventing welfare fraud"). In *Whyte v. Blair*, 885 P.2d 791 (Utah 1994), the first Utah Supreme Court case dealing with the new "common-law marriage" statute, the court dutifully accepted its obligation to develop common-law marriage "on a case-by-case basis." *Id.* at 794 n. 3. I write separately to critique the wisdom of trekking further down this case-by-case path and conclude that our Legislature should seriously consider pointing the involved administrative agencies and the courts in a different direction.

¶ 40 Further, I would dispose of this particular case based on the rationale that the Kelleys obtained their original divorce decree through fraud on the court. Thus, I would vacate the prior decree, leaving their original solemnized marriage intact. Under my analysis, if either of the Kelleys wants to dissolve those bonds of matrimony, he or she would do so in the prescribed manner without trying to delude the courts of this state.

## CRITIQUE OF COMMON–LAW MARRIAGE STATUTE

### I. History of Common–Law Marriage

¶ 41 "Common-law marriage" is a misnomer.[1] Common-law marriage probably did not exist in England, the home of the common law. The concept arose in "English ecclesiastical courts which administered canon law, rather than in the English common-law courts." John B. Crawley, *Is the Honeymoon Over for Common Law Marriage: A Consideration of the Continued Viability of the Common Law Marriage Doctrine*, 29 Cumb. L.Rev. 399, 401 (1998/1999). The House of Lords concluded in *Regina v. Millis*, 8 Eng. Rep. 844 (1843–44), that common-law marriage had never been recognized in England. Despite criticism of the ruling by some historians and academicians, *see* Crawley, *supra*, at 402 n. 12, the principle of stare decisis leads me to conclude that the issue has been settled as a matter of law. Thus, at a minimum, Utah Code Ann. § 30–1–4.5 (1998) should not be labeled as a "common-law marriage" statute. Better labels or terms would be "unsolemnized" or "nonceremonial" marriage statute.

¶ 42 The recognition of unsolemnized marriages in English ecclesiastical courts, the American colonies, and the several states has an equitable basis. In medieval England and the expanding American frontier it was virtually impossible for couples wanting to marry to find authorized persons to issue marriage licenses and perform ceremonies. *See* Crawley, *supra*, at 403. Common-law marriage was viewed as one means of solving these procedural difficulties. *See id.* New York was the first state to recognize unsolemnized marriages. *See Fenton v. Reed*, 4 Johns. 52, 53 (N.Y.Sup.Ct.1809) (per curiam). By the

---

1. I use the term advisedly and with some reluctance, as it is not an apt description of the doctrine. Nonetheless, because the statute and most of our cases use the term "common-law marriage," I shall also. Further, my short digest is meant to quickly summarize the evolution of common-law marriage, not provide a treatise.

end of the nineteenth century a majority of states recognized unsolemnized, long-term sexual unions. *See* David F. Crabtree, Development, *Recognition of Common–Law Marriages,* 1988 Utah L.Rev. 273, 275 n. 12 (listing thirty-four states, as of 1931, recognizing common-law marriages).

¶ 43 But from there, "common-law marriage" fell into disfavor and began to die a natural death. In modern America, the impediments to ceremonial marriage present in life on the frontier have long since disappeared. Transportation, communication, and hosts of legal administrators are readily available to help those wanting to marry. Accordingly, when Utah adopted its statute in 1987, only a dozen states still acknowledged common-law marriage. Now, Utah is one of only ten. *See* Mont.Code Ann. § 40–1–403 (1999); Utah Code Ann. § 30–1–4.5 (1998); *Campbell's Adm'r v. Gullatt,* 43 Ala. 57, 68–69 (1869); *Klipfel's Estate v. Klipfel,* 41 Colo. 40, 92 P. 26, 27–28 (1907); *McFarland v. McFarland,* 51 Iowa 565, 2 N.W. 269, 273–74 (1879); *Shorten v. Judd,* 60 Kan. 73, 55 P. 286, 287 (1898); *Warren v. Canard,* 30 Okla. 514, 120 P. 599, 600 (1911); *Knecht v. Knecht,* 261 Pa. 410, 104 A. 676, 678 (1918); *Holgate v. United Elec. Rys. Co.,* 47 R.I. 337, 133 A. 243, 244 (1926); *Berger v. Kirby,* 105 Tex. 611, 153 S.W. 1130, 1131 (1913). Thus, in two centuries, the American "affair" with common-law marriage has shifted the legal and financial responsibility for dependent women and children either away from or towards the state, depending on whether the doctrine of common-law marriage was in favor or not. *See* Ariela R. Dubler, Note: *Governing Through Contract: Common Law Marriage in the Nineteenth Century,* 107 Yale L.J. 1885, 1920 (1998).

¶ 44 One could claim that Utah is now first in the vanguard of a new cycle restoring common-law marriage to American society. However, it seems more likely that Utah's statute is an anachronistic rear guard. But, because we must, both the supreme court and this court have tried to develop the

doctrine of common-law marriage "on a case-by-case basis." *Whyte v. Blair,* 885 P.2d 791, 794 n. 3 (1994).

## II. Unintended Breadth of Common–Law Marriage Statute

¶ 45 The legislative history behind Utah's common-law marriage statute reveals a narrow, singular focus: preventing welfare fraud to save money for the various administrative agencies involved. *See In re Marriage of Gonzalez,* 2000 UT 28, ¶ 21, 1 P.3d 1074; David F. Crabtree, Development, *Recognition of Common–Law Marriages,* 1988 Utah L.Rev. 273, 280–81. During debate, legislators expressed concerns about the new common-law marriage statute's effect on polygamous relationships. Concern was also expressed regarding stale claims to marital status.[2] But all these were merely peripheral considerations. Moreover, there was no debate about the substantial question of how common-law marriage might affect existing family law and marriage as an institution and might intrude in other substantive areas of the law. The Legislature and administrative agencies were mainly interested in saving an estimated $323,500 in welfare benefits by establishing 300 common-law marriages (estimating that each common-law marriage established would save about $1,080). *See* Crabtree, *supra,* at 281 n. 43.[3]

¶ 46 This statute has injected the Utah judiciary into a debate which has raged for two centuries. However, I believe the Legislature is a better forum than the courts for debating the social and legal policy implications. *See generally* Ellen Kandoian, *Cohabitation, Common Law Marriage, and the Possibility of a Shared Moral Life,* 75 Geo. L.J. 1829, 1839 (1987) ("The question posed by the cohabitation cases is what to make of couples, in a state requiring a license and ceremony, who have obtained neither but come before a court on claims arising from their relationships.... In granting a remedy, the court thus establishes that formal marriage is not the only socially approved

---

2. If debated today, legislators would no doubt express concern about its effect on same-sex relationships.

3. Anyone interested in improving or repealing the common-law marriage statute should read this excellent discussion predicting many of the problems we are now having with the statute.

sexual relationship with rights and duties attaching; an alternative, informal type of marriage may also exist."); Ariela R. Dubler, Note: *Governing Through Contract: Common Law Marriage in the Nineteenth Century*, 107 Yale L.J. 1885, 1898 (1998) (describing "social tension[ ] between the power of marriage as a containment tool (i.e., marriage as a set of obligations) and its power as a social equalizer (i.e., marriage as a bestower of social and legal rights)").

¶ 47 Aside from the social and legal policy issues raised by common-law marriage, very real questions about the fiscal sensibility of the doctrine remain. The Legislature has the oversight capability and means to audit whether the numbers of common-law marriages created by administrative fiat and the expense incurred justify this process. Has the initial monetary savings goal been attained? Is containment of man-in-the-house fraud a reasonable rationale for maintaining the statute? Should Utah courts be expected to continue spending effort and resources to develop common-law marriage case law? Does the end justify the means? [4]

¶ 48 I now turn to a brief examination of the language of the statute and our appellate opinions to be specific about the disputes which are being generated. Strikingly, none of them involves welfare fraud.

### III. Review of Utah's Common–Law Marriage Statute and Case Law

¶ 49 First, I am concerned that the complexity of the statute itself creates problems. The provisions of section 30–1–4.5 show the Legislature tried to narrowly tailor the language to limit the types and thus the numbers of relationships which would qualify as the equal of solemnized marriages. *See* Utah Code Ann. § 30–1–4.5 (1998). This was done by creating a laundry list of five subsections, with six elements. *See id.* In litigation each element becomes a source of dispute. Therefore, if the Legislature wants to keep some form of common-law marriage, a simpler scheme with fewer elements might be the better approach.[5] After all, the essential elements of common-law marriage are actually relatively simple: "all that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations." 55 C.J.S. *Marriage* § 10 (1998) (citations omitted).

¶ 50 Second, the final phrase of the statute is also a cause for concern. It states that the relationship "may be proved under the same general rules of evidence as facts in other cases." Utah Code Ann. § 30–1–4.5(2) (1998). This general language results in a preponderance of the evidence standard. *See Hansen v. Hansen,* 958 P.2d 931, 934 (Utah Ct.App.1998). This low standard invites more people to sue for marriage recognition because they have an improved chance of winning. However, the historical evidentiary standard required clear and convincing evidence. The purpose of the higher standard was to limit pursuit of both stale and fraudulent claims. *See* 55 C.J.S. *Marriage* § 57 (1998) ("A claim of common-law marriage is regarded with suspicion and will be closely scrutinized especially where one of the purported spouses is deceased and the survivor is claiming a financial interest." (footnotes omitted)). This higher evidentiary

---

4. The Administrative Office of the Courts could survey the trial courts to determine the number and expense of adjudications involving common-law marriage. Perhaps there are many which are not appealed.

5. Alabama has a three-element scheme:

First, the parties must have the capacity to marry. Next, they must presently agree to enter the marriage relationship. Finally, they must consummate the marriage; that is, they must live in such a way as to gain public recognition that they are living as husband and wife. Like any other marriage, a common-law marriage can be terminated only by death or divorce. A party seeking to prove a common-law marriage must establish his claim by clear and convincing evidence.

John B. Crawley, *Is the Honeymoon Over for Common Law Marriage: A Consideration of the Continued Viability of the Common Law Marriage Doctrine*, 29 Cumb. L.Rev. 399, 405 (1998/1999) (footnotes omitted). The author, a judge, asserts that this scheme works well in the Alabama courts.

hurdle would also relieve the need for a one-year time limitation.

¶ 51 Third, I note another concern about which the statute is silent, i.e., who may file a petition to create a common-law marriage. I assume this was not mentioned so an administrative agency can instigate legal recognition of the marital relationship. At first blush, it seems this ought to be left to either one or both of the cohabiting persons. But, the object of the statute is otherwise. This statutory silence leaves an opening for other third parties to initiate a marriage recognition proceeding for the couple. Potential third parties include insurers, heirs, creditors, prosecutors, tax collectors, and those who have contractual relationships with the cohabitants. *See In re Marriage of Gonzalez*, 2000 UT 28, ¶¶ 1–4, 1 P.3d 1074 (plurality) (involving intervention of issuer of homeowner's insurance policy in putative wife's attempt to establish common-law marriage to insured); *Whyte v. Blair*, 885 P.2d 791, 792 (Utah 1994) (involving participation of insurance company in case in which putative husband tried to establish common-law marriage to insured).

¶ 52 A review of Utah cases to date reveals that Utah's statutory common-law marriage scheme has now implicated several other substantive areas of the law. Issues touching on the ownership and transfer of real and personal property have been raised by putative common-law spouses. *See Hansen*, 958 P.2d at 933 (seeking establishment of common-law marriage and grant of divorce, and requesting orders on child custody, child support, and property distribution); *Walters v. Walters*, 812 P.2d 64, 65 (Utah Ct.App.1991); *Layton v. Layton*, 777 P.2d 504, 505 (Utah Ct.App.1989); *Mattes v. Olearain*, 759 P.2d 1177, 1178 (Utah Ct.App.1988). Common-law marriage has also intersected with the criminal law. For instance, a convicted child sex abuser argued he had a common-law marriage to his victim's mother. *See State v. Johnson*, 856 P.2d 1064, 1068 (Utah 1993). In that case, the defendant tried to secure probation under a statute allowing probation in limited circumstances for a child's stepparent. *See id.* at 1067–68. And, currently, a county prosecutor has filed a motion in a criminal case to establish a common-law marriage between a man and one of his polygamous wives, so that the man might be prosecuted for bigamy. *See State v. Green*, No. 001600036 (Utah Dist.Ct. Apr. 17, 2000).

¶ 53 Our courts have also entertained several challenges to the constitutionality of the statute and, particularly, the one-year time limit for establishing the marital relationship. In *Bunch v. Englehorn*, 906 P.2d 918 (Utah Ct.App.1995), we held that the putative wife failed to establish a common-law marriage because she filed a complaint within one year after the relationship ended but did not get an adjudication order within one year. *See id.* at 920–21. Later, the Utah Supreme Court held that the time limitation of section 30–1–4.5 "requires only the *filing* of a petition for adjudication of marriage within one year after the termination of the relationship." *Gonzalez*, 2000 UT 28 at ¶ 30. This issue is still being contested with some frequency. *See Greaves v. Baker*, No. 990689 (Utah Ct.App. July 14, 2000) (certified to and pending in Utah Supreme Court) (addressing issues of whether filing within one year, rather than obtaining adjudication, is sufficient and whether time limitation violates Open Courts Clause of Utah Constitution); *Snarr v. Snarr*, 2000 UT App 150, slip op. at 2 (May 25, 2000) (unpublished memorandum decision) (concluding *Gonzalez* overruled *Bunch*); *Clark v. Clark*, 2000 UT App 54 (Mar. 2, 2000) (unpublished memorandum decision) (holding petition filed within one year of relationship's termination should not have been dismissed), *cert. granted*, No. 20000276–SC (June 21, 2000).

IV. Conclusion to Critique of Common-law Marriage in Utah

¶ 54 The English House of Lords ruled long ago that common-law marriage was never part of its common law. Most American states have already experimented with this doctrine. Based on their experience, all but ten have repealed common-law marriage. Utah should not recycle this great experiment. Common-law marriage is not well suited as a corrective remedy for ills afflicting the administrative law arena, particularly when the disease is allegedly man-in-the-

house welfare fraud. Our Legislature has the ability to—and should—prescribe a different administrative law remedy for welfare fraud without harmful side effects in other areas of the law.

## FRAUD UPON THE COURT [6]

¶ 55 The Kelleys have now told the court that their 1994 divorce decree was a collusive pretense. The trial court found that their agreed-upon divorce "created a legal fiction only, designed to protect the residence of the parties from the threat of creditors." A fiction is "[a]n imaginative creation or a pretense that does not represent actuality but has been invented." *American Heritage Dictionary* 500 (2d ed.1985). In other words, the Kelleys' divorce was a lie.

¶ 56 Moreover, they made the court an unwitting participant in their deception. Thus, they " 'defile[d] the court itself' " and prevented the judicial system from performing "in the usual manner its impartial task" of adjudicating cases. 12 James W. Moore, *Moore's Federal Practice* § 60.21[4][a] (3d ed.1997). The Kelleys' ground for divorce was an artifice to defraud creditors, not a genuine case of irreconcilable differences. In fact, they were fully reconciled; they were in complete agreement. Thus, they were not legally entitled to a divorce decree. Accordingly, I would vacate the 1994 decree and restore them to their former legal status— that of husband and wife. I will now explain the legal support for this sua sponte action.

### I. Issue May Be Raised Sua Sponte

¶ 57 Fraud upon the court may be raised by the court sua sponte and an appeals court may vacate a lower court decree on this ground. *See* 12 James W. Moore, *Moore's Federal Practice* § 60.21[4][f] (3d ed.1997). This inherent equitable power existed at common law. In *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), a fraud-upon-the-court case, the United States Supreme Court noted the tension between the rule that judgments are final and the "rule of equity ...

that under certain circumstances, one of which is after-discovered fraud, relief will be granted." *Id.* at 244, 64 S.Ct. at 1000. This equitable rule was "fashioned to fulfill a universally recognized need for correcting injustices." *Id.* It should be exercised cautiously, but when the occasion demands, the power has been wielded "without hesitation" and equity can be interposed to "devitalize[ ] ... judgment[s]." *Id.* at 245, 64 S.Ct. 997 at 1001. In setting aside a collusive divorce, the court restores the "*status quo ante* " and prevents enforcement of the illegal transaction. *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798, 801 (2d Cir.1960) (citing to Recent Cases, *Clean–Hands Doctrine Prevents Husband from Setting Aside Collusive Divorce and Property Settlement Induced by Wife's Fraud*, 67 Harv. L.Rev. 1079 (1954)). In Utah divorce proceedings, fraud, deceit, collusion, and perjury are "wrongs against the state and a fraud upon the court" which the state may raise on its own motion. *Parsons v. Parsons*, 40 Utah 602, 607, 122 P. 907, 909 (1912). Further, Rule 60(b), Utah Rules of Civil Procedure, expressly states that it has no effect on a court's inherent power to set aside a judgment procured through "fraud upon the court." Utah R. Civ. P. 60(b).

¶ 58 When there is collusion, as in this case, neither of the parties is likely to come forward and propose to the court that they have jointly perpetrated some wrong on the court. Even so, we gave the Kelleys the chance to address this issue in supplemental briefs. Predictably, each concluded that the other had committed fraud upon the court. Their respective conclusions weigh heavily in support of my position. In *Toscano v. Commissioner of Internal Revenue*, 441 F.2d 930 (9th Cir.1971), the court addressed the problem of who is to initiate the process of reviewing fraud upon the court: " 'Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be

---

**6.** Fraud upon the court is defined differently in the context of divorce than in traditional fraud cases, which require proof of several elements.

*See generally Pace v. Parrish*, 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952).

mute and helpless victims of deception and fraud.'" *Id.* at 935 (quoting *Hazel–Atlas,* 322 U.S. at 246, 64 S.Ct. at 1001).

¶ 59 This statement explains why we should act sua sponte in this case. If we do not, we cannot expect collusive subversion of the legal process to be exposed. And, if not exposed and dealt with, we can expect similar conduct in the future.

## II.  Finality of Initial Divorce Decree

¶ 60 Courts and commentators caution that this doctrine is to be construed narrowly to preserve the finality of judgments and to avoid overlap with Rule 60(b)(3) of the Utah Rules of Civil Procedure and its federal counterpart.[7]  *See Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.,* 12 F.3d 1080, 1085 (Fed.Cir.1993); *Great Coastal Express, Inc. v. International Bhd. of Teamsters,* 675 F.2d 1349, 1356 (4th Cir.1982); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2870 (2d ed.1995). "This salutary general rule springs from the belief that in most instances society is best served by putting an end to litigation...." *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1944). But, a final judgment has never "been regarded as completely immune from impeachment." *Id.* Moreover, the Kelleys have chosen to engage in ongoing litigation. They are able to do so because in divorce actions the trial court "has continuing jurisdiction to make subsequent changes or new orders for the custody of the children and their support [and] maintenance ... and for distribution of the property and obligations for debts as is reasonable and necessary." Utah Code Ann. § 30–3–5(3) (Supp.1999).

¶ 61 Further, the record indicates that neither of the Kelleys has remarried, nor has any child been born as issue of any new marriage. So, no third party would be seriously affected by vacating the decree. Thus, I perceive little need to respect the finality of their divorce decree.

## III.  Analysis

¶ 62 Marriage is much more than a mere contract. Marriage is a "public institution of universal concern [whose] dissolution affect[s] the right not only of the husband and wife but of all other persons." 2 Joel P. Bishop, *New Commentaries on Marriage, Divorce, and Separation* § 480 (1891) (footnote omitted). As such, "the public becomes in effect a party to the proceeding." *Id.* at § 481. For this reason, parties cannot agree to dissolve their own marriages for convenience. *See id.; Whyte v. Blair,* 885 P.2d 791, 795 (Utah 1994) ("A couple may not enter and exit a marriage for simple financial convenience."); *Hilton v. Roylance,* 25 Utah 129, 137, 69 P. 660, 663 (1902) (stating marriages may not be dissolved at "the mere intention and pleasure of the contracting parties"). That is precisely what happened here.

¶ 63 The Kelleys agreed that through the artifice of a "paper divorce" they would shield themselves from creditors but continue holding themselves out to their children, families, neighbors, friends, and the public as wife and husband. The trial court entered findings that the Kelleys carried out their deceptive scheme as planned. The court found that Mr. Kelley told Dr. Marty Hood that the divorce "was only a business thing and that the children would never know." The court also found that "neither party expected the property aspects of the divorce to be valid or implemented" and that they "continued to cohabit and hold each other out as spouse[s]" in the community.

¶ 64 In *Karren v. Karren,* 25 Utah 87, 69 P. 465 (1902), a couple conspired in a similar way. The husband told his wife that he would obtain a default divorce to induce his father to convey title to a homestead which his father refused to do if he remained married. *See id.* at 466. He promised that after obtaining the divorce and deed, they would remarry. *See id.* The wife agreed to this stratagem and did not appear or defend the

7.  The text of Rule 60(b) makes it clear that fraud upon the court determinations are made outside the bounds of Rule 60. The Rule states that it "does not limit the power of a court to entertain an independent action ... to set aside a judgment for fraud upon the court." Utah R. Civ. P. 60(b).

divorce action. *See id.* The husband did not fulfill his part of the collusive bargain, married another, and was expecting a child with his new wife. *See id.* at 466, 467. The first Mrs. Karren then sued to vacate the decree. *See id.* at 466. The supreme court held that a decree of divorce obtained by any of the following conduct is a fraud upon the court: (1) collusion of the parties, (2) suppression of the facts, or (3) false testimony. *See id.* In the *Karren* case, the court declined to grant relief because of the husband's remarriage and the fact that he was expecting a child with his new wife. *See id.* at 466–67. Here we have no such equitable concern for either of the Kelleys. Neither has remarried and no other children are involved.

¶ 65 The trial court's findings regarding the Kelleys' conduct brings them within the *Karren* definition of fraud upon the court. Indeed, they obtained their decree of divorce under a collusive agreement and by suppressing the truth.

¶ 66 In cases when courts have invoked their equitable powers to remedy fraud upon the court,

the relief granted has taken several forms: setting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it. But whatever form the relief has taken in particular cases, the net result has been the same: where the situation has required the court has, in some manner, devitalized the judgment.

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 245, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944) (footnote omitted). In this case, the appropriate remedy is to vacate the decree.[8]

---

8. Vacating the divorce decree relieves the courts from having to consider further the following issues addressed by the main opinion:
   Section I. Non-solemnized Marriage Statute
   Section II. Establishment of Common-law Marriages
   Section III. Modification of the Decree
   Section IV. Temporary Support Order

Section V. Alimony
My colleagues' effort to untangle the issues spun by the Kelleys is commendable. However, the Kelleys were not entitled to it. "Oh, what a tangled web we weave, when first we practice to deceive." Sir Walter Scott (1771–1832). John Bartlett, *Familiar Quotations* 378:13 (16th ed.1992).