2024 UT App 145

## THE UTAH COURT OF APPEALS

IN THE MATTER OF THE ADOPTION OF D.K.A.T.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

D.C.T.,
Appellant,
*v.*
E.K.S. AND A.R.S.,
Appellees.

Opinion
No. 20231102-CA
Filed October 10, 2024

Third District Court, Salt Lake Department
The Honorable Su Chon
The Honorable Dianna Gibson
No. 222900174

Steve S. Christensen and Wesley D. Hutchins,
Attorneys for Appellant

Larry S. Jenkins and Lance D. Rich,
Attorneys for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

ORME, Judge:

¶1 D.K.A.T. (Child) was born in Minnesota, where she lived for over two and a half years until her biological mother (Birth Mother) relinquished her to a Utah adoption agency (the Agency). Birth Mother misrepresented to the Agency that Child's biological father was unknown. The Agency placed Child with E.K.S. and A.R.S. (Adoptive Parents), and some seven months later, a Utah district court finalized their adoption of Child. A week later, D.C.T. (Biological Father) filed a paternity action in Minnesota

district court, claiming to be Child's biological father and seeking to establish parental rights. A few months later, Biological Father filed motions in Utah district court seeking to intervene in the adoption proceeding and to set aside the adoption. Following a two-day trial in Utah, the court concluded, among other things, that Biological Father had not fully complied with Minnesota law to establish parental rights and denied both motions.

¶2      On appeal, Biological Father raises several challenges to the denial of his motions, including that his right to due process was violated when he—a Minnesota resident—was subjected to Utah law and that the adoption decree was based on fraud and a misapplication of law. We affirm.

## BACKGROUND[1]

¶3      In 2015, Biological Father and Birth Mother began a romantic relationship and soon moved in together. At all relevant times, Biological Father and Birth Mother were residents of Minnesota. Their "relationship was, at times, toxic, hostile and destructive." In 2016, following a domestic dispute, Biological Father pled guilty in a Minnesota court to one charge of making terroristic threats, and the court entered a no-contact order prohibiting him from contacting Birth Mother. Biological Father and Birth Mother separated in December 2017 or January 2018.

¶4      In early April 2018, Birth Mother married another man (Husband). Less than a week later, on April 7, Child was born in Minnesota. Biological Father was not named on Child's birth certificate. That same month, Biological Father conducted a home paternity test, which indicated a 99.99% probability of a biological relationship between Biological Father and Child. But the test results came with a warning that because there was no strict chain

---

1. We recite the facts in the light most favorable to the trial court's findings. *See In re adoption of B.H.*, 2020 UT 64, n.2, 474 P.3d 981.

of custody of the genetic samples, the result may not be accepted in a court of law. Because Birth Mother was married at the time of Child's birth, Husband was Child's presumed father under Minnesota law. *See* Minn. Stat. § 257.55(1)(a) (2024). Biological Father testified at trial that a month or two after Child's birth, he learned that Birth Mother had married Husband prior to giving birth. Biological Father and Husband never rebutted Husband's presumed fatherhood by signing a recognition of parentage, as provided for by Minnesota statute. *See id.* § 257.75(1)(a).

¶5     Birth Mother and Husband divorced in September 2018. Neither the joint petition for divorce nor the divorce decree addressed any children born during the brief marriage. Biological Father testified at the trial in our case that he resumed living intermittently with Birth Mother in September 2018 and that he lived with her full-time from October 2018 until April 2019. But the trial court found this testimony to be "inconsistent," and it noted that other than GPS data, which did not conclusively prove his assertion,[2] Biological Father "provided no evidence, such as mail, utility bills, tax returns, or other documents, to show that he openly resided with [Birth Mother] on the dates he claims."

¶6     Biological Father testified that after he moved out of Birth Mother's home, Child regularly visited him every other weekend at his parents' home from June 2019 until July 2020. In support of this claim, several video clips of Child playing with members of Biological Father's family were submitted into evidence, and various family members testified regarding Child's visits to Biological Father's parents' home. But the court noted that Biological Father did not appear in any of the video clips and that

---

2. The trial court discounted the GPS data because it did not include data for "every day or even every workday" and because the data could not distinguish between whether he was visiting Birth Mother or living with her.

the family members' testimony was limited to *their* visits with Child.

¶7 Biological Father also testified that he regularly and consistently provided financial support for Child until at least the summer of 2020. He submitted a summary of monthly rent receipts for amounts ranging between $300 and $400 that he claimed to have paid for Birth Mother from November 2017 to May 2020. But the trial court noted that some of the MoneyGrams he used to compile the summary were "either difficult or impossible to read" and that they "do not specifically show that any of the money was actually sent to [Birth Mother], her bank or to a landlord." Biological Father also provided between 20 and 30 receipts for items he claimed he purchased for Child, but the court noted that some of the receipts indicated that the items were purchased by his family members and that some of the receipts were dated after or just before Child was placed for adoption in Utah and that none of those items were sent to Child. Some of Biological Father's family members also testified regarding purchases he made for Child, but evidence of those purchases was limited to the family members' testimony. Biological Father also submitted receipts for three weeks of daycare for Child. But the court noted text messages between Biological Father and Birth Mother that were submitted into evidence "do not show that [Biological Father] provided much, or any, financial support to" Child. Based on these evidentiary issues, the court stated that "[u]nder the circumstances, [it was] unable to put a monetary value on what, if anything, [Biological Father] paid towards the Child's support."

¶8 In June 2020, apparently feeling that she could no longer care for Child, Birth Mother left Child on the porch of Biological Father's parents' house. Child remained with Biological Father's parents for a few days until child protective services placed her with her maternal grandmother, who soon returned Child to Birth Mother's care. But later that month, child protective services removed Child from Birth Mother's home following an

altercation with Biological Father.[3] Although Biological Father testified that Child resided with him for the rest of June and part of July 2020, the court found more credible his mother's testimony that Child resided with her during that time.

¶9       Around this time, a caseworker repeatedly told Biological Father that he should pursue custody of, or secure visitation rights with, Child. But Birth Mother regained physical custody of Child in mid-July, from which point Biological Father had "little to no contact" with Child. He testified he last saw or spoke with Child in July or August 2020.

¶10       In October 2020, Birth Mother texted Biological Father that Child was sick and pleaded with him to purchase medicine. She also told Biological Father that Child did not have a coat. The trial court found that Biological Father "made no effort or offer to check on the Child, take her to the doctor, or to get any medicine for her." In his text messages, Biological Father asserted that Child only had allergies and was not sick. He also stated that Child already had a coat, but the court noted that he testified he had not seen Child for approximately three months and would not have known if she had a coat that still fit. Biological Father told Birth Mother that he did not mind providing for Child, but he did not wish to get caught up in Birth Mother's "drama." There was no indication from the text exchange that Biological Father ever purchased the requested medicine or coat for Child.

¶11       On December 8, 2020, Birth Mother relinquished Child—then over two and a half years old—to the Agency in Utah, which placed her with Adoptive Parents. The Agency's executive director testified that Birth Mother told the Agency that Child was

---

3. Biological Father testified that after he and Birth Mother argued in a restaurant, she left Child behind with him without a car seat. He said he then drove Child back to Birth Mother's apartment, where Birth Mother damaged the dashboard of his car with a screwdriver and kicked in a window.

conceived during a sexual assault by an unknown man while she was unconscious. Birth Mother also included a version of this claim in a signed document she submitted to the Agency. The director also testified that the Agency did not know that Birth Mother was married to Husband at the time of Child's birth and that the Agency was unaware of Biological Father's claim to be Child's biological father.

¶12 The next day, on December 9, Birth Mother informed Biological Father that she had relinquished Child for out-of-state adoption, and she texted him photos of Child with Adoptive Parents' family. Three days later, she texted Biological Father more photos of Child with Adoptive Parents and commented on how happy Child looked. A few days after that, Birth Mother texted Biological Father a picture of an invitation to her prior wedding to Husband and a screenshot from a website that indicated that unmarried fathers who do not establish paternity have no rights toward a child. She told him, "I tried to build a relationship with you by asking you to sign her birth certificate but you didn't want to." Biological Father replied, "No need to contact me anymore!! I'll do what I gotta do!!!" At trial, Biological Father testified that he was referring to taking legal action. He contacted an attorney that month, but no action was taken at that time. Prior to the finalization of Child's adoption in July 2021, Biological Father neither filed a paternity action nor registered as her putative father with the Minnesota Fathers' Adoption Registry.

¶13 At the end of December 2020, Birth Mother texted Biological Father, "BITCH YOUR DAUGHTER IS DEAD," and she sent a picture of a child lying down with closed eyes. She also texted, "WE DON'T HAVE A KID TOGETHER," followed by another personal insult. But Biological Father testified that four days later, Birth Mother called and informed him that Child was still alive and living in an undisclosed location. And a week later, she texted him more photos and videos of Child with Adoptive Parents. Sometime that December, Biological Father contacted

police in Minnesota to conduct a welfare check on Child. The police informed Biological Father as early as January 2021 that Birth Mother had told them that she had relinquished Child for adoption.

¶14 On July 6, 2021, the Utah district court entered an Order and Decree of Adoption (the Decree) declaring Child legally adopted by Adoptive Parents. Child was about three years and three months old at the time. The court's associated findings of fact and conclusions of law indicated, in relevant part, as follows:

- Birth Mother "was unmarried at the time of conception and birth and chooses to exercise her right of privacy pursuant to Utah Code § 78B-6-102(7) and not disclose the identity of the biological father";

- "Evidence was presented that no unmarried biological father registered with the putative father registry of Utah or Minnesota";

- "Pursuant to Utah Code § 78B-6-121, the consent of the birth father is not required, and he has surrendered, forfeited or waived any right in relation to the child including the right to notice. The final Decree should reflect and decree that the birth father has failed to assert or claim his rights and therefore his rights are forever waived, surrendered, forfeited or terminated"; and

- "The parental rights of birth parents have been waived, surrendered, forfeited, and permanently terminated."

¶15 On July 13, 2021—over seven months after he was first informed that Child was relinquished and placed with Adoptive Parents and one week after the Decree was entered—Biological Father filed a paternity action in Minnesota district court. Husband was not named a party to the action. Biological Father also filed a motion requesting sole physical and legal custody of

Child, which the Minnesota court denied stating that it "cannot grant [Biological Father] custody, even on a temporary basis, until he has been adjudicated the biological father of" Child. The court also indicated that at the upcoming review hearing, the parties must be prepared to discuss, among other things, "[i]f there is a final order for adoption from this state or any other" and whether Biological Father "has registered for the Fathers' Adoption Registry and the effect that this registration or failure to register would [have on] a pending or finalized adoption proceeding." By the time the Utah district court entered its amended findings of fact and conclusions of law following the trial on Biological Father's motions to intervene and to set aside the adoption, the Minnesota court had not entered any ruling adjudicating Biological Father as Child's father. Nor had Husband, as Child's presumed father, been joined as a necessary party in the paternity action.

¶16    On August 27, 2021, Biological Father's Minnesota counsel sent a letter to the Agency informing it of Biological Father's claim to be Child's biological father and of the pending Minnesota paternity action. The Agency's executive director testified at trial that this was the first time the Agency became aware of Biological Father and his claims. Counsel's letter to the Agency also recognized Husband's status as Child's presumed father and suggested that he was a necessary party who needed to be joined in the Minnesota paternity action.

¶17    On October 5, 2021, Biological Father filed in Utah district court a motion to intervene in the adoption proceeding, a motion to set aside the Decree, and a motion seeking custody of Child. Adoptive Parents opposed his motion to intervene, arguing that it was untimely and that he was not entitled to notice of the adoption because he had not been adjudicated as Child's biological father prior to the adoption. The court granted Biological Father "limited intervention to determine whether he is the biological father and whether he timely established parental rights."

¶18    In February 2022, Biological Father filed a motion to unseal the entire adoption file. He asserted that he might have additional grounds on which to set the Decree aside, such as fraud, and requested that the file be unsealed so that he might pursue that potential avenue. The court entered an order allowing the adoption file to be unsealed for any documents relating to Biological Father's motions to intervene and to set aside the Decree but denying his request to unseal the entire file.[4]

¶19    The court held a two-day bench trial on the matter in May and July 2022, and entered findings of fact and conclusions of law, which it shortly thereafter amended following a stipulated motion by the parties. The court's amended findings are summarized above.

¶20    Turning to its legal conclusions, the trial court stated that "entry of the adoption decree on July 6, 2021, is of great importance." It also acknowledged the competing interests between an unmarried biological father's "inchoate interest in a child," the adoptive parents' and child's "statutory and constitutional rights in their relationship with each other," and the State's interest in providing stable and permanent homes for adoptive children and in preventing disruption of their placements.

¶21    Referencing Minnesota law, the court held that Biological Father did not timely file his Minnesota paternity action because he filed it a week after the Utah court had already entered the Decree. *See* Minn. Stat. § 257.57(6) (2024) ("If the child has been adopted, an action may not be brought."). The court also noted that Biological Father's paternity action was further complicated

---

4. Judge Su Chon entered the Decree and issued the order allowing for Biological Father's limited intervention, while Judge Dianna Gibson ruled on Biological Father's motion to unseal the adoption file, conducted the trial in this matter, and ruled on his motion to intervene and to set aside the Decree.

by Husband being Child's presumed father under Minnesota law and by Biological Father's failure to join him as a party. And the court held that due to chain of custody issues, the home paternity test Biological Father completed was insufficient to create a parental presumption under Minnesota law.

¶22 As for Biological Father's motion to set aside the Decree, the court noted that Minnesota Adoption Procedure Rule 47.02 sets a 90-day post-adoption deadline to file a motion to set aside an adoption and that here, Biological Father filed his motions to intervene and to set aside the Decree in Utah district court 91 days after entry of the Decree. Accordingly, the court concluded that Biological Father "seeks a remedy [in Utah court] that would be procedurally barred as untimely under Minnesota law."

¶23 Next, the court addressed whether Biological Father was entitled to notice of the adoption proceeding and whether his consent was required under Utah law. In conducting that analysis, the court stated that "[t]he requirements of Section 78B-6-121 do not apply if the unmarried biological father does not know or have reason to know of a 'qualifying circumstance' pursuant to Subsection 78B-6-122(1)(a) prior to the birth mother signing her relinquishment or consent to adoption of the child." Thus, because it was undisputed that Biological Father "did not know and could not have known of a 'qualifying circumstance,'" the court focused its analysis on whether Biological Father "strictly satisfied the other requirements of Section 78B-6-122 as well as other sections of the Utah Adoption Act." As part of that analysis, under section 78B-6-122(1)(c)(i)(B), the court addressed whether prior to Birth Mother's relinquishment of Child on December 8, 2020, Biological Father "fully complied with the requirements to establish parental rights and duties in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child, imposed by" Minnesota law.

¶24 The court pointed to the fact that, despite knowing within a couple of months of Child's birth that Birth Mother was married

to Husband when Child was born, Biological Father did not timely pursue legal action to rebut the legal presumption that Husband was Child's father. The court further held that even if Biological Father had filed a paternity action and joined Husband as a necessary party prior to entry of the Decree, he still would not have "qualif[ied] as a presumed father or for notice of the adoption under" Minnesota law. Specifically, under Minn. Stat. section 257.55(1)(d), a man is the presumed father if, "while the child is under the age of majority, he receives the child into his home and openly holds out the child as his biological child." And under Minn. Stat. section 259.49(1)(b)(4), a father must receive notice of an adoption proceeding if he "is openly living with the child or the person designated on the birth record as the natural mother of the child, or both."

¶25   At trial, Biological Father claimed to have lived with Child from October 2018 until April 2019 when he moved in with Birth Mother shortly after her divorce from Husband and for several weeks in June and July 2020 after child protective services removed Child from Birth Mother's care. Concerning the first period, the court reasoned that even if the GPS data Biological Father submitted proved that he lived with Birth Mother and Child at that time, "he provided no evidence that he shared an address with [Birth Mother] on mail, utility bills, tax returns, or other documents." The court also noted that Biological Father did not submit into evidence any photographs of himself with Child, much less of the two of them at Birth Mother's apartment. Accordingly, the court concluded that even if he resided with Birth Mother at that time, "it does not appear that he was doing so openly." As for the second period, the court found the testimony of Biological Father's mother credible that Child resided with her after Child was removed from Birth Mother's care. Accordingly, the court held that the evidence was insufficient to prove that Biological Father openly resided with Birth Mother and Child "for any period of time."

¶26    The trial court also rejected Biological Father's argument that he was entitled to notice of the adoption proceedings pursuant to Minn. Stat. section 259.49(1)(b)(2), which requires notice to a parent who "has substantially supported the child." The court again discussed the problems with the evidence Biological Father provided to support his claims that he contributed toward Birth Mother's rent and that he purchased clothing, groceries, and other items for Child. The court also noted that text messages between Biological Father and Birth Mother showed that Biological Father "was reluctant to step up and agree to an order of child support." The court indicated that a "prime example" of Biological Father's "failure to provide sufficient financial support" for Child was the October 2020 text message exchange in which Birth Mother pleaded with Biological Father to purchase medicine and a coat for Child. In light of all this, the court held that although Biological Father "may have provided some financial support for the Child, . . . such financial support was not sufficient to meet the Child's needs and not substantial enough to require his notice to the adoption" under Minnesota law.

¶27    Next, the court held that even if Biological Father "had timely established parental rights and the right to notice in Minnesota, he was required to have demonstrated a full commitment to his parental responsibilities under the totality of the circumstances" pursuant to Utah Code section 78B-6-122(1)(b). The court then analyzed each relevant factor listed under that section, one of which was whether Biological Father "offered to provide and, unless the offer was rejected, did provide, financial support for" Child or Birth Mother. Utah Code Ann. § 78B-6-122(1)(b)(iv) (LexisNexis Supp. 2023).[5] In addressing

---

5. Because the applicable provisions of the Utah Code in effect at the relevant time do not differ from those in the most current printed version of the Utah Code in any way material to this appeal, we cite that version of the code for convenience.

that factor, the court stated that Birth Mother's text messages submitted at trial "strongly suggest that she would have accepted financial support from him if he had been willing to offer it." The court then indicated that Biological Father's claims that he provided financial support to Birth Mother by contributing toward her rent and purchasing groceries and other items were not "fully" supported by the documentation. And the court stated that, in any event, even if it "were to believe some or all such claims," Biological Father's claimed financial support "did not meet the Child's needs." After considering the other factors listed in section 78B-6-122(1)(b), the court concluded that under the totality of the circumstances, Biological Father had "not demonstrated a full commitment to his parental responsibilities to" Child.

¶28 The court also concluded that Biological Father's consent to the adoption was not required under Utah Code section 78B-6-120.1(3)(c) because he gave implied consent by "knowingly leaving the adoptee with another person, without providing for support, communicating, or otherwise maintaining a substantial relationship with the adoptee, for six consecutive months." The court pointed to Biological Father's lack of contact with Child after child protective services returned Child to Birth Mother's care in July 2020 and to Biological Father's failure to take legal action to obtain custody of Child even after Birth Mother informed him that she had relinquished Child for adoption. The court noted that although Biological Father asserted that Birth Mother prevented him from contacting Child, the evidence showed that Birth Mother reached out to him seeking assistance to care for Child and Biological Father provided no evidence that he furnished any financial assistance after July 2020. The court thus found that Biological Father "knowingly" left Child with Birth Mother "without providing for support, communicating, or otherwise maintaining a substantial relationship with the Child for at least six consecutive months" and that Biological Father thereby gave implied consent to the adoption.

¶29 Lastly, citing Utah Code section 78B-6-106(1)–(2), the court held that Birth Mother's misrepresentations and "failure to identify [Biological Father] as a potential biological father of [Child], although unfortunate and regrettable, do[] not excuse him from strictly complying with the statutory requirements." The court further stated that although Birth Mother's "misrepresentations to the [A]gency are reprehensible, the effect of her misrepresentations could have been avoided had [Biological Father] taken prompt legal action to establish parental rights to" Child. That is, if Biological Father had filed a paternity action or registered with the Minnesota Fathers' Adoption Registry prior to entry of the Decree, the Agency and Adoptive Parents would have been made aware of his asserted parental interest in Child.

¶30 Based on the foregoing findings of fact and conclusions of law, the trial court held that Biological Father's "consent to the adoption was not required pursuant to the Utah Adoption Act"; Biological Father's "consent to the adoption is implied"; Biological Father had not established grounds for setting aside the Decree; and "[b]ecause the adoption was valid, [Biological Father] has no grounds for custody of" Child. Accordingly, the court denied Biological Father's motion to intervene, motion to set aside the Decree, and motion seeking custody of Child.

¶31 Biological Father subsequently filed a motion for a new trial and a renewed motion to unseal the adoption file. Among other things, Biological Father argued that the trial court lacked subject matter jurisdiction over the adoption proceeding and personal jurisdiction over the parties. He also contended that the Decree should be set aside under rules 60(b) and 60(d) of the Utah Rules of Civil Procedure for fraud. Specifically, he asserted that Birth Mother, the Agency, and Adoptive Parents conspired to deceive the trial court into entering the Decree.

¶32 The court denied both motions. It held that because Biological Father was not entitled to intervene in the adoption

case, he lacked standing to challenge entry of the Decree, which included raising jurisdictional challenges. And in addressing the renewed motion to unseal the adoption file, the court stated that because Biological Father's motion to intervene was denied, his motion to unseal was likewise denied.

¶33 Next, in addressing Biological Father's fraud arguments, citing *Kelley v. Kelley*, 2000 UT App 236, 9 P.3d 171, the court first distinguished "fraud on the court" from "fraud or misrepresentation which may occur in the context of a proceeding." *See id.* ¶ 28 n.10. The court then held that Biological Father "failed to present evidence to support that there was a conspiracy to deprive him of his parental rights." The court stated that although Birth Mother's statements filed with the court contained misrepresentations, the evidence showed that the Agency did not know of Biological Father's claims until he moved to intervene in the adoption case, and there was no evidence showing that Adoptive Parents were aware of Biological Father. Thus, the court concluded that while "there were misrepresentations made in the context of the adoption proceeding, the evidence does not support that there was a 'fraud on the court.'" The court then reiterated that although Birth Mother's misrepresentations to Biological Father (i.e., that Child had died, which she corrected four days later) and to the Agency (i.e., not disclosing the existence of Biological Father or Husband) "are concerning," "the biggest impact on [Biological Father's] parental rights was his own failure to establish himself as [Child's] legal or presumptive father under Minnesota law."

¶34 This appeal followed.

ISSUES AND STANDARDS OF REVIEW

¶35 Biological Father raises several issues for our consideration. He first argues that because he is a Minnesota resident not subject to Utah law, the trial court's denial of his

motion to intervene violated his right to due process. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (quotation simplified).

¶36 Biological Father alternatively contends that the trial court erred as a matter of law—both at the time the Decree was entered and when it denied his motion to intervene—in ruling that he was not entitled to receive notice of the adoption proceeding and that his consent to the adoption was not required under Utah law. "The proper interpretation and application of a statute is a question of law which we review for correctness." *McFarland v. McFarland*, 2021 UT App 58, ¶ 19, 493 P.3d 1146 (quotation simplified). Also, "as a general matter, the factual findings underpinning an intervention ruling are subject to a clearly erroneous standard while the district court's legal conclusions are reviewed for correctness." *Gardiner v. Taufer*, 2014 UT 56, ¶ 13, 342 P.3d 269 (quotation simplified).

¶37 Biological Father also asserts that the trial court lacked subject matter jurisdiction over the adoption proceeding. "Whether a district court has subject matter jurisdiction is a question of law and we review the district court's determination for correctness." *Summerhaze Co. v. FDIC*, 2014 UT 28, ¶ 8, 332 P.3d 908 (quotation simplified).

¶38 Biological Father next argues that the Decree should be set aside due to fraud under rule 60(b) of the Utah Rules of Civil Procedure.[6] "A district court has broad discretion in ruling on a

---

6. Biological Father also asserts that the Decree "should be set aside based upon outright fraud and/or fraud upon the Court under Rule 60(d)." But rule 60(d)—which provides, with our emphasis, that rule 60 "does not limit the power of a court to entertain *an independent action* to relieve a party from a judgment,

(continued…)

motion to set aside an order or judgment under rule 60(b), and thus, we review a district court's denial of a 60(b) motion under an abuse of discretion standard." *In re Discipline of Spencer*, 2022 UT 28, ¶ 11, 513 P.3d 759 (quotation simplified).

¶39 Relatedly, Biological Father argues that the trial court erred in denying his renewed motion to unseal the adoption file, which would allow him to gather additional evidence of fraud. We review a trial court's decision on a motion to unseal an adoption file for an abuse of discretion, but we review the court's underlying legal conclusions for correctness. *In re adoption of M.A.*, 2024 UT 6, ¶ 10, 545 P.3d 241.

ANALYSIS

I. Due Process

¶40 Biological Father argues that he, "as a resident of Minnesota, was under no obligation to strictly comply with" any requirement of the Utah Adoption Act (the Adoption Act), *see* Utah Code Ann. §§ 78B-6-101 to -146 (LexisNexis 2022 & Supp. 2023), and that requiring him to do so violated his right to due process.[7] Accordingly, he asserts that because he had no

---

order or proceeding or to set aside a judgment for fraud upon the court"—does not apply because Biological Father did not file an independent action for fraud on the court. *See In re Estate of Willey*, 2016 UT 53, ¶ 11 n.7, 391 P.3d 171.

7. Biological Father raises two additional constitutional challenges, neither of which we reach on the merits. First, he argues that the trial court failed to consider whether Child had a constitutionally protected right to know and to be with her biological father. But because Biological Father made this argument for the first time in a post-trial motion and the trial court

(continued…)

obligation to comply with Utah law, "his right to intervene in this case, as well as his rights to seek all other relief, including setting aside the Decree, remain fully intact."

¶41 "At its core, the due process guarantee is twofold—reasonable notice and an opportunity to be heard." *In re adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215. These guarantees serve as "a significant protection against the arbitrary extinguishment of important rights." *Nevares v. M.L.S.*, 2015 UT 34, ¶ 23, 345 P.3d 719. However, an unmarried biological father's right to develop a parental relationship with his child is "provisional" and "due process requires only that an unwed father have a meaningful

---

did not address the merits of that argument, this issue is not preserved for appeal, and Biological Father has not argued that it qualifies under an exception to our preservation rule. *See Donjuan v. McDermott*, 2011 UT 72, ¶ 21, 266 P.3d 839 ("Generally, the fact that a party is asserting constitutional claims does not excuse him from complying with the preservation rule."); *State v. Pinder*, 2005 UT 15, ¶ 46, 114 P.3d 551 ("Although a new argument may be advanced when moving for a new trial, the trial court may refuse to consider the merits of the argument because it may find the issue waived. If the trial court refuses to address the merits of the newly advanced argument, the issue remains unpreserved for appellate review and may be addressed only if the challenging party can show plain error or exceptional circumstances.") (quotation simplified).

Biological Father also argues that the denial of his motion to intervene violated the Open Courts provision of the Utah Constitution. *See* Utah Const. art. I, § 11. Biological Father's argument on this issue, which is limited to three short paragraphs and contains several conclusory statements, is insufficient to carry his burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(8); *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which a party may dump the burden of argument and research.") (quotation simplified).

chance to preserve his opportunity to develop a relationship with his child." *In re Baby Girl T.*, 2012 UT 78, ¶ 11, 298 P.3d 1251 (quotation simplified). *See id.* ¶ 18 ("Under both federal and state law, an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when he demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child.") (quotation simplified).

¶42    Our Supreme Court has held that "a father's due process right to be heard is infringed where his rights are foreclosed for failure to comply with the Adoption Act but he could not reasonably have expected his baby to be born in Utah, or he did not know and could not reasonably have known that his child would be placed for adoption in Utah." *In re adoption of B.Y.*, 2015 UT 67, ¶ 33 (quotation simplified). Conversely, "a father who knows of a pregnancy and has reason to suspect that his child will be born in or placed for adoption in Utah must fulfill the requirements of the Utah Adoption Act." *Id.* ¶ 34.

¶43    This due process standard is codified in Utah Code section 78B-6-122 (Section 122), which identifies certain "qualifying circumstances" that indicate the likelihood that a mother would place her child for adoption in Utah. *See* Utah Code Ann. § 78B-6-122(1)(a) (LexisNexis Supp. 2023). Section 122 further requires an unmarried biological father's consent to the adoption if:

> (A) the unmarried biological father did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed;

(B) before the mother executed a consent to adoption or relinquishment of the child for adoption, the unmarried biological father fully complied with the requirements to establish parental rights and duties in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child, imposed by:

> (I) the last state where the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that the mother resided in before the mother executed the consent to adoption or relinquishment of the child for adoption; or

> (II) the state where the child was conceived; and

(C) the unmarried biological father has demonstrated, based on the totality of the circumstances, a full commitment to his parental responsibilities . . . .

*Id.* § 78B-6-122(1)(c). Accordingly, under Section 122, "a father's right to contest an adoption remains intact so long as he fully complied with the adoption requirements of the state whose laws he *could have* expected to apply." *In re adoption of B.Y.*, 2015 UT 67, ¶ 34 n.6 (emphasis in original; quotation simplified). Section 122 thus "supplies a choice-of-law solution that avoids the significant due process problems that could follow from holding a father to the elements of the Utah Adoption Act where the father lacks a sufficient basis for anticipating its application." *Id.* Here, it is undisputed that Biological Father did not know and had no reason to know of any qualifying circumstance indicating a likelihood that Birth Mother would place Child for adoption in Utah.

¶44    Biological Father argues that our Supreme Court's decision in *Nevares v. M.L.S.*, 2015 UT 34, 345 P.3d 719, is controlling. At issue in that case was a paternity action initiated in Utah district court over a child who was conceived in Colorado but who was born in Utah and placed for adoption in Utah. *Id.* ¶¶ 3, 5. The child's unmarried biological father did not know and had no reason to know of the mother's plans to give birth in Utah and to place the child for adoption in Utah. *Id.* ¶ 14. The district court dismissed the paternity action on the ground that the father did not take any affirmative steps under Colorado law to establish paternity over the child. *Id.* ¶ 8. Although the court acknowledged that Colorado law did not require the father to take identified affirmative steps, the court interpreted Section 122 "to require a father to affirmatively establish paternity before acquiring any right to notice of an adoption proceeding." *Id.* ¶¶ 8, 14. Our Supreme Court reversed. *Id.* ¶ 47. In relevant part, the Court held that the district court's interpretation of Section 122 "would implicate serious due process concerns, as it would require an unwed father in Colorado who had no idea of any plans for a Utah adoption to construe Colorado law through the lens of the Utah statute." *Id.* ¶ 15. In other words, requiring the father "to fulfill requirements not imposed on him by Colorado law" would hold "him to a legal regime to which he could not reasonably have expected to be bound," thereby violating due process. *Id.* ¶¶ 25-26.

¶45    Biological Father asserts that like the father in *Nevares*, he "cannot be reasonably expected to comply with a Utah law that Minnesota law does not impose upon him." But here, Biological Father does not provide any analysis of what Minnesota law requires to establish paternity—much less assert that he complied with those requirements—nor does he challenge the trial court's analysis of Minnesota law. Minnesota law expressly precludes the initiation of paternity actions "[i]f the child has been adopted." Minn. Stat. § 257.57(6) (2024). And although Child was over three years old when the Decree was entered, and despite knowing

Birth Mother was married to Husband at the time of Child's birth, Biological Father took no steps to establish paternity until a week after the adoption was finalized in Utah.[8] The trial court also held that even if Biological Father had filed a paternity action prior to the adoption, he still would not have "qualif[ied] as a presumed father or for notice of the adoption under" Minnesota law because he never openly lived with or substantially supported Child. *See id.* §§ 257.55(1)(d), 259.49(1)(b)(2), (4). Because Biological Father has not provided focused analysis on Minnesota law—particularly whether the affirmative steps he could have taken were mandatory or, like Colorado law, optional—he has not carried his burden of persuasion on this issue.

¶46 Biological Father further contends that his right to due process was violated when the trial court relied on Utah Code section 78B-6-106 in ruling that Birth Mother's misrepresentations and "failure to identify [Biological Father] as a potential biological father of" Child in the documents she submitted to the Agency, "although unfortunate and regrettable, do not excuse [Biological Father] from strictly complying with the statutory requirements" of the Adoption Act—more specifically, Section 122. That statute states, in relevant part, that "[a] fraudulent representation is not a defense to strict compliance with the requirements of [the Adoption Act] and is not a basis for dismissal of a petition for adoption, vacation of an adoption decree, or an automatic grant

_____

8. Biological Father also asserts that the trial court erred in concluding that he was required to comply with Minnesota law "before [Birth Mother] executed her relinquishment and consent to adoption on December 8, 2020." *See* Utah Code Ann. § 78B-6-122(1)(c)(i)(B) (LexisNexis Supp. 2023). But he does not address the court's conclusion that because he filed his paternity action in Minnesota district court a week after the adoption was finalized, the action also was untimely even under Minnesota law. *See* Minn. Stat. § 257.57(6) (2024) ("If the child has been adopted, an action may not be brought.").

of custody to the offended party." Utah Code Ann. § 78B-6-106(2) (LexisNexis 2022).

¶47 We need not directly address the interplay between section 78B-6-106 and unmarried biological fathers who did not know and could not have reasonably known of Section 122's qualifying circumstances because Birth Mother's misrepresentations, although inexcusable, did not affect Biological Father's ability to comply with Section 122—which was the basis of the trial court's denial of his motions to intervene and to set aside the adoption. Biological Father's argument focuses on Birth Mother's misrepresentations to the Agency and to the trial court at the time the Decree was entered. Specifically, he asserts that the documents Birth Mother submitted to the Agency and to the court contained over ten misrepresentations regarding Child's biological father, including that she did not know who he was, the extent of his relationship with Child, and that Child was conceived during a sexual assault. But because Biological Father did not know and did not have reason to know of qualifying circumstances, the relevant inquiry was whether he had complied with Minnesota law to establish his parental rights, which analysis the trial court conducted, thereafter concluding Biological Father had not complied with Minnesota law.[9]

---

9. Biological Father lists a number of other provisions of the Adoption Act that the trial court referenced in its findings of fact and conclusions of law. But Biological Father has not argued how such references violate due process in light of the trial court's conclusion that he was not entitled to notice of the adoption proceeding or to give consent to the adoption under Minnesota law. Even assuming the trial court erred in addressing provisions of the Adoption Act in addition to concluding that Biological Father would not have been entitled to relief under Minnesota law, any such error "was harmless beyond a reasonable doubt." *State v. Benson*, 2014 UT App 92, ¶ 30, 325 P.3d 855 (quotation

(continued…)

¶48　In sum, because Biological Father has not challenged the trial court's holding that he failed to comply with Minnesota law to establish parental rights—which law Biological Father would reasonably have expected to apply—this case is distinguishable from *Nevares*, and Biological Father's due process argument fails.

## II. Notice and Consent to Adoption

¶49　Biological Father alternatively argues that the Decree should be set aside due to the trial court's misapplication of Utah law, which resulted in the deprivation of his rights to receive notice of the adoption proceeding and to give his consent to the adoption.[10]

¶50　When entering the Decree, the trial court's associated findings of fact and conclusions of law indicated that "[e]vidence was presented that no unmarried biological father registered with the putative father registry of Utah or Minnesota" and that "[p]ursuant to Utah Code § 78B-6-121, the consent of the birth father is not required, and he has surrendered, forfeited or waived any right in relation to the child including the right to notice." Although the court did not identify which subsection of section 78B-6-121 (Section 121) it relied on in concluding that neither

---

simplified), *cert. denied*, 333 P.3d 365 (Utah 2014). Indeed, as discussed in greater detail in Part II below, nothing in the Adoption Act expressly precludes an unmarried biological father who fails to satisfy the requirements of Section 122 from attempting to additionally establish a right to notice and consent under section 78B-6-121 of the Adoption Act—but by doing so, the father is availing himself of Utah law.

10. Based on the premise of this argument, namely that Utah statutes were violated, in this section we focus our analysis exclusively on Utah law and do not consider whether the application of certain provisions of the Adoption Act violated Biological Father's right to due process.

notice nor consent was required, Biological Father asserts that the court's reference to a "putative father registry" suggests that the conclusion was based on subsection (3). *See* Utah Code Ann. § 78B-6-121(3)(c) (LexisNexis 2022). Biological Father further argues that the court's presumed reliance on subsection (3) was erroneous because that subsection applies only to adoption cases where the child "is six months old or less at the time the child is placed with prospective adoptive parents," *id.* § 78B-6-121(3), and here, Child was two years and eight months old at the time she was placed with Adoptive Parents. Biological Father asserts that the court was instead required to conduct an analysis under subsection (1), which applies to cases where the child is more than six months old at the time of the child's placement with prospective adoptive parents. *See id.* § 78B-6-121(1). Specifically, he asserts that the court was required to determine whether he "developed a substantial relationship with" Child and whether he "openly lived with" Child prior to her placement with Adoptive Parents. *Id.* § 78B-6-121(1)(a)–(b). Based on this omission, Biological Father asserts that the court sidestepped legal prerequisites before entering the Decree.

¶51 As an initial matter, the court's reference to a "putative father registry" does not implicate only subsection (3). Rather, subsection (7) directs that in cases involving a child who was not "conceived or born within a marriage,"[11] regardless of the child's age, petitioners must file a certificate stating "that a diligent search has been made of the registry of notices from unmarried biological fathers described in" subsection (3). *Id.* § 78B-6-121(7)(a). Thus, although we agree with Biological Father that, given Child's age at the time of her placement with Adoptive Parents, subsection (1)—and not subsection (3)—governed

---

11. Because Birth Mother was married to Husband at the time of Child's birth, subsection (7) technically does not apply to this case. But at the time of the Decree's entry, based on Birth Mother's misrepresentations, the court was unaware of her marriage.

Child's adoption case, it is more likely that the court's reference to the registry was based on subsection (7). Accordingly, there is no strong indication that at the time of entry of the Decree, the trial court erroneously applied subsection (3) instead of subsection (1).

¶52    In any event, after Biological Father moved to intervene and to set aside the Decree, the court—which was previously unaware of his existence—held a trial and ruled on the issue of whether notice of the adoption and Biological Father's consent to the adoption were required, ultimately concluding that they were not. But even then, the court sidestepped the required subsection (1) inquiry, stating that "[t]he requirements of [Section 121] do not apply if the unmarried biological father does not know or have reason to know of a 'qualifying circumstance' pursuant to [Section 122] prior to the birth mother signing her relinquishment or consent to adoption of the child." This was in error. The trial court was not precluded from conducting an inquiry under Section 121 in this case.

¶53    Section 121 and Section 122 address the circumstances under which an unmarried biological father is entitled to notice of the adoption proceeding and his consent to the adoption is required.[12] Section 121 provides, in relevant part, that "[e]xcept as

_____

12. The right to notice of the adoption proceeding is included in Section 121 and Section 122 through Utah Code section 78B-6-110(2)(a), which mandates that notice be given to any person whose consent is required under section 78B-6-120 or Section 121. Section 78B-6-120(1)(f), in turn, incorporates Section 122 by requiring the consent of an unmarried biological father who "fully and strictly complies with the requirements of [Section 121] and [Section 122]." Additionally, Section 122 states that "[a]n unmarried biological father who does not fully and strictly comply with the requirements of [Section 121] and [Section 122] is considered to have waived and surrendered any right in relation

(continued…)

provided in Subsections (2)(a) and 78B-6-122(1) . . . , with regard to a child who is placed with prospective adoptive parents more than six months after birth, consent of an unmarried biological father is not required unless the unmarried biological father" satisfies certain requirements. *Id.* § 78B-6-121(1). Section 122 states, among other things, that "[n]otwithstanding the provisions of [Section 121], the consent of an unmarried biological father is required with respect to an adoptee who is under the age of 18 if," prior to the birth mother's relinquishment of the child or execution of a consent to adoption, the father "did not know, and through the exercise of reasonable diligence could not have known," of a "qualifying circumstance," and if certain other conditions are met. *Id.* § 78B-6-122(1)(c) (Supp. 2023). *See also id.* § 78B-6-122(1)(a) (defining "qualifying circumstance").

¶54    Under Section 121's plain terms, notice of the adoption proceeding and consent to the adoption are required only if the unmarried biological father satisfies certain requirements. Section 121 also expressly states that one of the exceptions to its subsection (1) is set forth in Section 122. Section 122, in turn, provides additional circumstances that, if satisfied, trigger the requirement of notice and consent—the threshold requirement of which is that the father did not know and could not have reasonably known of certain "qualifying circumstances." Accordingly, if a trial court were to conclude that the requirements of either section are met, notice and consent are required, and the court need not additionally determine whether notice and consent are required under the other section. But if the court were to conclude that the requirements of one of the sections are not met, the father might nonetheless be entitled to notice and consent if he satisfied the requirements of the other section.

---

to the child, including the right to . . . notice of any judicial proceeding in connection with the adoption of the child." Utah Code Ann. § 78B-6-122(2)(a) (LexisNexis Supp. 2023).

¶55 This is not what happened here. Because it was undisputed that Biological Father "did not know and could not have known of a 'qualifying circumstance,'" the trial court analyzed whether Biological Father satisfied Section 122's other requirements, concluding that he did not. But the court did not then address whether Biological Father was nevertheless entitled to notice and consent under Section 121. Instead, it simply stated that Section 121 does "not apply if the unmarried biological father does not know or have reason to know of a 'qualifying circumstance' pursuant to" Section 122. Nothing in either section supports that conclusion. Rather, as discussed above, having concluded that notice and consent were not required under Section 122, the court was not precluded from addressing whether they were nonetheless required under Section 121.

¶56 Nevertheless, Biological Father is not entitled to reversal. As an initial matter, the trial court entered sufficient findings of fact—which Biological Father does not challenge on appeal—to allow us to conclude that Biological Father would not have satisfied the Section 121 requirements.

> An appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court.

*Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (quotation simplified). *See Olguin v. Anderton*, 2019 UT 73, ¶ 20, 456 P.3d 760 ("It is within our discretion to affirm a judgment on an alternative ground if it is apparent in the record.") (quotation simplified).

¶57    Section 121 provides that in cases involving children who are over six months old at the time of their placement with prospective adoptive parents, notice and consent are not required unless the father satisfies the requirements of either subsection (1)(a) or subsection (1)(b). Utah Code Ann. § 78B-6-121(1)(a)–(b). Based on the trial court's extensive findings, we hold that Biological Father did not satisfy the requirements of either subsection.

¶58    Subsection (1)(a) requires an unmarried biological father to have, among other things, "demonstrated a full commitment to the responsibilities of parenthood by financial support of the child of a fair and reasonable sum in accordance with the father's ability." *Id.* § 78B-6-121(1)(a)(iii). This is similar to Section 122's requirement that the father demonstrate, "based on the totality of the circumstances, a full commitment to his parental responsibilities."[13] *Id.* § 78B-6-122(1)(c)(i)(C). And for purposes of that inquiry, subsection (1)(b) of Section 122 provides a list of factors that a trial court must consider, if applicable, as part of this totality-of-the-circumstances inquiry, including "whether he offered to provide and, unless the offer was rejected, did provide, financial support for the child or the child's mother." *Id.* § 78B-6-122(1)(b)(iv).

¶59    As part of its Section 122 analysis, the trial court addressed and considered each of the factors and ultimately concluded that based on "the totality of the circumstances," Biological Father had "not demonstrated a full commitment to his parental responsibilities to" Child. Concerning the financial support factor,

---

13. This requirement reflects the principle under federal law that "an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when he demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child." *In re Baby Girl T.*, 2012 UT 78, ¶ 18, 298 P.3d 1251 (quotation simplified).

the court indicated that various text messages Birth Mother sent Biological Father "strongly suggest that she would have accepted financial support from him if he had been willing to offer it." The court also stated that Biological Father's claims that he provided financial support to Birth Mother by contributing toward her rent and by purchasing groceries and other items were not fully supported by the evidence. The court further found that even if it believed "some or all such claims," the claimed financial support "did not meet the Child's needs."

¶60 The court also addressed financial support in the context of deciding whether Biological Father was entitled to notice of the adoption under Minnesota law. After again discussing the evidentiary issues with Biological Father's claims that he paid Birth Mother's rent and purchased groceries and other items, the court found that based on certain text messages between Biological Father and Birth Mother, Biological Father was "reluctant to step up and agree to an order of child support." The court further stated that a "prime example" of Biological Father's "failure to provide sufficient financial support" for Child was when Birth Mother asked him to purchase medicine and a coat for Child, who was sick at the time. Biological Father told Birth Mother that he did not mind providing for Child but he wished to stay out of Birth Mother's "drama." He also "made no effort or offer to check on the Child, take her to the doctor, or to get any medicine for her," and the text messages do not indicate that Biological Father ever purchased the requested medicine or coat for Child.

¶61 In light of these findings, we conclude that Biological Father likewise has not satisfied Section 121's requirement that he "demonstrated a full commitment to the responsibilities of parenthood by financial support of the child of a fair and reasonable sum in accordance with the father's ability." *Id.* § 78B-6-121(1)(a)(iii). Biological Father was unwilling to agree to regular child support, the trial court was not persuaded by Biological Father's claims of financial support he gave Mother,

and, in any event, the claimed financial support was insufficient to meet Child's needs.

¶62 Biological Father also would not have satisfied subsection (1)(b)'s alternative requirement that he "openly lived with" Child "for a period of at least six months during the one-year period immediately preceding the day on which" Child was placed with Adoptive Parents. *Id.* § 78B-6-121(1)(b)(i)(A)(I). Birth Mother relinquished Child to the Agency on December 8, 2020. The Agency placed Child with Adoptive Parents either that same day or the next day, as evidenced by the pictures Mother sent Biological Father on December 9 of Child with Adoptive Parents. To satisfy subsection (1)(b), Biological Father needed to live with Child for at least six months between December 9, 2019, and December 9, 2020.

¶63 Biological Father testified that he lived with Birth Mother and Child full-time from October 2018 until April 2019.[14] Biological Father testified that after moving out, Child regularly visited his parents' home every other weekend until July 2020. Child lived with Biological Father's parents for a few days in June 2020 after Mother left her on their porch. Not long afterward, Child returned to live with Biological Father's parents for a few weeks in June and July 2020 after being removed from Birth Mother's care by child protective services. Biological Father testified that he last saw Child in July or August 2020. Accordingly, Biological Father did not live with Child at all in the

---

14. The trial court found this testimony to be "inconsistent," and it noted that the GPS data he submitted into evidence did not conclusively prove his assertion and that Biological Father "provided no evidence, such as mail, utility bills, tax returns, or other documents, to show that he openly resided with [Birth Mother] on the dates he claims." *See supra* note 2. But even taking Biological Father's testimony at face value, this is not sufficient to satisfy subsection (1)(b) as those dates fall outside the applicable one-year range.

year prior to her placement with Adoptive Parents, and subsection (1)(b)'s requirement is therefore not met.

¶64   Biological Father is also not entitled to reversal because he has not challenged the trial court's alternative ruling that, irrespective of Section 121 or Section 122, he gave implied consent to the adoption. *See Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12 ("We will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges only [some] of those grounds.") (quotation simplified).

¶65   Utah Code section 78B-6-120.1(3)(c) provides that consent to adoption may be implied by, among other things, the act of "knowingly leaving the adoptee with another person, without providing for support, communicating, or otherwise maintaining a substantial relationship with the adoptee, for six consecutive months."[15] In concluding that Biological Father gave implied consent, the court relied on the lack of evidence that he ever saw or financially supported Child after she was returned to Birth Mother's care in July 2020. The court also pointed to Biological Father's seven-month delay in taking legal action after Mother informed him in December 2020 that she had relinquished Child for adoption. Biological Father has not appealed any aspect of this ruling.

¶66   In sum, because the trial court's findings support the conclusion that Biological Father did not satisfy the applicable Section 121 requirements and because Biological Father has not challenged the trial court's alternative ruling that he gave implied

---

15. Utah Code section 78B-6-110(2)(a)(iii) provides, with our emphasis, that notice must be given to any person whose consent is required under Section 121 or section 78B-6-120, "*unless* that right has been terminated by" implied consent. Accordingly, Biological Father's implied consent to the adoption further obviates any notice requirement.

consent, we affirm the court's conclusion that Biological Father was not entitled to notice and consent under Utah law.

### III. Other Issues

¶67 Biological Father raises three other issues for our consideration. We address each in turn.

¶68 **Subject Matter Jurisdiction.** Biological Father asserts that because Adoptive Parents were not residents of Utah and because Child was born in Minnesota, the trial court lacked subject matter jurisdiction to enter the Decree pursuant to Utah Code section 78B-6-105(1).[16] That statute states, in relevant part, that

> (1) An adoption proceeding shall be commenced by filing a petition in:
>
> (a) the district court in the district where the prospective adoptive parent resides;
>
> (b) if the prospective adoptive parent is not a resident of this state, the district court in the district where:

---

16. Biological Father's argument concerning subject matter jurisdiction also nominally invokes a personal-jurisdiction challenge. But Biological Father does not provide any meaningful analysis on personal jurisdiction, much less provide citations to legal authority. Biological Father also suggests that the trial court "likely" lacked jurisdiction over the adoption proceeding pursuant to the federal Parental Kidnapping Prevention Act. *See* 28 U.S.C. § 1738A(g). But other than quoting the relevant federal statute, his argument is limited to a single sentence. Biological Father has thus not carried his burden of persuasion on either of these issues, and we do not address them further. *See* Utah R. App. P. 24(a)(8).

> (i) the adoptee was born;
>
> (ii) the adoptee resides on the day on which the petition is filed; or
>
> (iii) a parent of the proposed adoptee resides on the day on which the petition is filed[.]

Utah Code Ann. § 78B-6-105(1) (LexisNexis Supp. 2023). Although Biological Father acknowledges this court's prior holding that the statute "speaks to venue, and does not limit a court's subject-matter jurisdiction," *In re adoption of B.N.A.*, 2018 UT App 224, ¶ 24, 438 P.3d 10, he asserts that "[e]ven a cursory review of the possible venues listed in the statute reveals that no district court in Utah can establish venue, thereby effectively stripping Utah of any jurisdiction over the case." We disagree.

¶69 Utah Code section 78B-6-134(3) directs that at the time a child is relinquished to an adoption agency, "the agency shall have custody and control of the child" and that "until the final decree of adoption is entered by the court, the agency has the right to the custody and control of the child" even if the child is placed with prospective adoptive parents. Additionally, this court has held that Utah "has an interest in protecting adoptees who are in the custody and control of Utah-based agencies, regardless of whether those adoptees are born in or placed with adoptive parents in Utah," *In re adoption of B.F.S.*, 2020 UT App 149, ¶ 12, 478 P.3d 46, and that it "makes little sense to deny an adoption agency the benefit of the law based on a venue provision premised on the location of prospective adoptive parents," *id.* ¶ 8 n.3. Accordingly, Biological Father's subject matter jurisdiction challenge premised on section 78B-6-105(1) is unavailing.

¶70 **Fraud.** Biological Father argues that the Decree should be set aside because it "was obtained through either fraudulent misrepresentations and/or fraud on the court" under rule 60(b) of the Utah Rules of Civil Procedure. Specifically, he points to Birth

Mother's misrepresentations to the Agency and to the trial court that Child was conceived during a sexual assault and that the identity of her biological father is unknown.[17] But Biological Father's argument does not address the trial court's denial of his rule 60(b) motion to set aside the Decree, much less explain how the court's denial constituted abuse of the "broad discretion" afforded trial courts in ruling on such motions. *See In re discipline of Spencer*, 2022 UT 28, ¶ 11, 513 P.3d 759 (quotation simplified). Accordingly, Biological Father has not carried his burden of persuasion on this issue, and we do not consider it further.

¶71 **Motion to Unseal the Adoption File.** Lastly, we address Biological Father's challenge to the trial court's denial of his renewed motion to unseal the adoption file. The court based its denial of that motion on its denial of his motion to intervene. Because we affirm the trial court's determination that Biological Father was not entitled to notice of the adoption proceeding and that his consent to the adoption was not required, we likewise affirm the court's denial of the renewed motion to unseal the adoption file.

---

17. Biological Father also asserts that the Agency and Adoptive Parents perpetrated fraud on the court by misrepresenting Child's age to induce the court to apply subsection (3) of Section 121 instead of subsection (1). Biological Father bases this belief on the trial court's reference to a "putative father registry." But, as discussed in Part II above, the court's reference to the registry was much more likely based on subsection (7), which the court would have applied regardless of Child's age. *See supra* ¶ 51.

Moreover, in denying Biological Father's motion for a new trial, the trial court stated that the evidence showed the Agency was unaware of Biological Father's existence and claims until after he moved to intervene in the adoption case, and there was no evidence indicating that Adoptive Parents were somehow aware of Biological Father.

CONCLUSION

¶72    For the foregoing reasons, we affirm the trial court's denial of Biological Father's motions to intervene, to unseal more of the adoption file, and to set aside the Decree.

—————